405 F.2d 41
 CONNECTICUT GENERAL LIFE INSURANCE COMPANY and United Aircraft Corporation, Appellants,
v.
Charles CRATON et al., and Seminole Lodge 971, International Association of Machinists and Aerospace Workers, Appellees.
 No. 25112.
 United States Court of Appeals Fifth Circuit.
 December 6, 1968.
 
 Joseph C. Wells, Washington, D. C., John M. Farrell, Palm Beach, Fla., for appellants, Patterson, Belknap, Farmer, Shibley & Wells, Washington, D. C., Burns, Middleton, Rogers & Farrell, Palm Beach, Fla., of counsel.
 Joseph P. Manners, Miami, Fla., for appellees, Manners & Amoon, Miami, Fla., of counsel.
 Before GOLDBERG, GODBOLD and SIMPSON, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This case brought under the aegis of § 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185,[1] involves questions of contract interpretation in both a collective bargaining agreement and a group disability insurance policy. These contracts share a common and fraternal fallibility found in many contracts in that they have failed by their terms to anticipate the contingencies upon which the parties ultimately found themselves in disagreement.
 
 
 2
 The present action was initiated in the district court below by Seminole Lodge 971 of the International Association of Machinists and Aerospace Workers (Seminole) in conjunction with 214 of its individual members. Plaintiffs sought a declaratory judgment, damages and injunctive relief to enforce a collective bargaining agreement between Seminole and United Aircraft Corporation (United), or, in the alternative, to enforce the provisions of a group insurance policy. The insurance policy, issued by Connecticut General Life Insurance Company (Connecticut General), had been secured by United pursuant to its obligations under the collective bargaining agreement with Seminole. When a dispute subsequently arose as to the meaning of a term in the insurance policy, the sufficiency of United's compliance with its collective bargaining agreement was also put in issue.
 
 
 3
 The collective bargaining agreement that United is alleged to have violated was entered into in late 1965 and early 1966. It dealt with the basics of labor management negotiations pertaining to wages, hours, grievances and the like and incorporated them into one written document. Although insurance programs were also discussed in these negotiations, the insurance terms agreed upon were placed in an ancillary letter agreement.
 
 
 4
 During the negotiations, United made available to union officials a pamphlet entitled "Highlights of Improved Group Insurance Plan For Hourly Rated Employees." This pamphlet described insurance provisions relating to accident and sickness insurance, surgical expense benefits, survivor income benefit insurance, hospital expense insurance, and other matters relating to the costs of illness. In most respects the insurance coverage described by the pamphlet was familiar to the union negotiators because similar provisions had appeared in earlier group insurance policies. However, in one respect the new insurance proposal was quite different. The pamphlet indicated that the new insurance policy would contain a provision for "coordination of benefits" (C.O.B.). This concept was described by the United pamphlet in pertinent part as follows:
 
 
 5
 "When, for example, more than one member of a family works, such as husband and wife, and each is covered as a dependent under the other's group insurance plan, and dependent children are covered under both plans, the problem of over-insurance arises. This means, for example, that when one of these people is sick or injured, he may collect from both plans total benefits which may exceed his expenses and thereby produce a `profit' after all the bills are paid. This is not the purpose of group insurance. This situation results in higher than necessary group insurance premium cost to the employee.
 
 
 6
 "The insurance industry has produced a fair answer — called Coordination of Benefits — C.O.B. This means that when an employee or one of his dependents, covered by two or more group plans, is sick or injured, the insurance companies involved work together in paying up to 100% of his allowable expenses — but no more."
 
 
 7
 * * * * * *
 
 
 8
 "We will under the revised group insurance program coordinate with all group plans both hospital-medical and disability income with respect to the employee and/or his dependents, including disability income payments under Social Security. We will not coordinate with benefit plans under individual policies."
 
 
 9
 Based upon the explanation of C.O.B. contained in United's pamphlet and the oral representations of United's negotiators,[2] Seminole and United entered into the above mentioned ancillary letter agreement. This agreement, drafted by United, contained a section on coordination of benefits that was essentially a rescript of the C.O.B. description of United's pamphlet. It was understood by the parties that United would secure insurance in compliance with the terms of this letter agreement, and that such insurance would then be made available to United's employees on a voluntary participation basis.[3] Subscribers to the group insurance coverage were to receive individual certificates of insurance reflective of the master insurance policy issued to United by Connecticut General.
 
 
 10
 On January 16, 1966, Seminole's membership ratified the terms of the ancillary letter agreement. Subsequently, Connecticut General delivered to the insured employees certificates of insurance and explanatory insurance guides. These individual insurance certificates and the master insurance agreement between United and Connecticut General contained the following provision on coordination of benefits:
 
 
 11
 "If during any week an Employee is entitled to receive benefits under one or more of the following plans which provide periodic disability income payments:
 
 
 12
 (a) * * * * *
 
 
 13
 (b) Any plan toward which any employer of the Employee contributes or makes payroll deductions,
 
 
 14
 (c) Labor-management trusteed plans, union welfare plans, employer organization group plans, employee benefit plans, and/or
 
 
 15
 (d) The Social Security Act,
 
 
 16
 his Amount of Weekly Disability Income under Section 1 of the contract will be reduced for that week by the amount he is entitled to receive under such plan or plans in accordance with (a) through (d) above."
 
 
 17
 Sometime in February, 1966, plaintiffs became aware that the above provisions were being interpreted by both United and Connecticut General in a manner inconsistent with plaintiffs' view of the collective bargaining agreement. Benefits being paid to union members as a result of their participation in a program called the Mutual Benefit Fund were being deducted from payments owing to employees covered by Connecticut General's insurance policy. Plaintiffs therefore brought suit to enjoin further deductions, to recover those that had already been made, and to obtain a declaratory judgment of their rights under the collective bargaining agreement and the insurance policy.
 
 
 18
 At trial United and Connecticut General claimed that such deductions were authorized by the coordination of benefits clause in the insurance policy because the Mutual Benefit Fund was either a "union welfare plan" or an "employee benefit plan." Payments under such plans, they argued, could properly be offset against disability benefits owing under the group insurance policy. In rebuttal, plaintiffs contended that there was no indication in any of the written documents available to them during their negotiations with United, or in United's verbal communications, that the Mutual Benefit Fund was the type of plan includable within the terms of the coordination of benefits clause. United's chief negotiator admitted that the Mutual Benefit Fund was never mentioned in the negotiations. Furthermore, plaintiffs argued that the insurance certificate and the health insurance guide were not available to them when the ancillary letter agreement was negotiated and ratified.
 
 
 19
 The district court after a full hearing and after a consideration of interrogatories taken from both defendants entered judgment for plaintiffs. It found that United Aircraft Corporation had been primarily responsible for the misunderstanding between United and Seminole as to the extent to which the insurance policy was to be coordinated with other benefit programs. On this basis, the court concluded that there had been no manifestation of mutual intent or meeting of the minds concerning the inclusion of the Mutual Benefit Fund within the coordination of benefits clause, and that therefore the deductions had been wrongfully made. United and Connecticut General were ordered to cease and desist from further coordinating or setting off disability income payments against benefits paid out to members of the Mutual Benefit Fund, and United was ordered to pay to the individual plaintiffs and to other members of the Fund all moneys withheld and deducted. Defendants thereupon entered this appeal. For reasons set forth below, we reverse.
 
 
 20
 The district court determined that because the Union and United had not specifically addressed themselves to, nor had they achieved a meeting of the minds on, the interrelationship between the group insurance policy and the Mutual Benefit Fund, no coordination of benefits between the two had been intended. While we agree that the Fund's benefits are not deductible, we take a very different path to that result.
 
 
 21
 The ancillary letter agreement between Seminole and United contains a provision which stipulates that the group insurance policy is to be coordinated with "all group plans both hospital-medical and disability income." While such a provision does not necessarily compel inclusion of the Mutual Benefit Fund within the purview of the collective bargaining agreement, it does suggest the inappropriateness of concluding that the Fund was excluded from coverage merely because it was not mentioned by name. Reasonable certainty, not absolute certainty, is the general contractual standard. Frank Sullivan Company v. Midwest Sheet Metal Works, 8 Cir. 1964, 335 F.2d 33; Restatement of the Law of Contracts, § 32 (1932).
 
 
 22
 We are urged to accept the thesis that because the specifics of deductibles derived from benefit payments to employees from sources alien to United and Connecticut General were not on the negotiating agenda or specifically dealt with, there was no meeting of the minds. Yet many contractual disputes arise out of phraseology without the benefit of verbal preludes or prefaces. Contractual negotiations do not always address themselves to the minutiae of contracts. Parties may instead prefer more general and comprehensive terminology. Whatever their approach, they can hope for clarity, but cannot expect omniety.
 
 
 23
 In cases like the present one where general terminology was chosen, it is not to be supposed that absent the mention of a particular item like the Mutual Benefit Fund in connection with a general phrase like "group plan," the particular item is automatically to be excluded. Were this so, general language would be substantially ineffective in a contract, and all the details of an agreement would have to be expressed or adverted to by the parties during negotiations or in the contract itself in order to make an agreement truly effective. This seems an unrealistic requirement. Contracting parties being less than sibylline do not always cast their contracts in a prophetic mold. Not only are parties to a contract often incapable of foreseeing all contingencies, but there are even occasions, and we would include among them many collective bargaining agreements, where statements of general purpose tend to smooth the way toward consensual harmony where the elaboration of detail would only destroy it. Parties to a contract must be accorded the right to emphasize their similarities and minimize their differences even at the expense of specificity. To say therefore as a general rule that contractual parties must have a specific meeting of the minds on every item in a contract or else expect that each unmentioned item will be treated as a nullity can only have the unfortunate consequence of perpetuating an outdated and mechanical jurisprudence.
 
 
 24
 In the case at bar we find that the Union and United did in fact have a sufficiently detailed understanding regarding the coordination of insurance benefits with other group plans to entitle such provision to judicial enforcement. However, whether or not the parties intended the Mutual Benefit Fund to come within the scope of that understanding is a matter that must be determined in light of the purposes which the coordination of benefits clause was intended to effectuate. It is a generally accepted precept of contract law that the principal apparent purpose of the parties is to be given great weight in the resolution of contractual uncertainties and in the determination of probable intentions. Restatement of the Law of Contracts, § 236(b) (1932); United States v. Essley, 1960, 284 F.2d 518; Nevada Half Moon Mining Co. v. Combined Metals R. Co., 10 Cir. 1949, 176 F.2d 73, cert. denied, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581. Broadly speaking, it is the duty of the court in the construction of written contracts "to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed." Adler v. Nicholas, 5 Cir. 1967, 381 F.2d 168, 171; Underwood v. Underwood, Fla.1953, 64 So.2d 281, 288.
 
 
 25
 In the case at bar an examination of the coordination of benefits provision as explained in the ancillary letter agreement indicates that United and the Union intended the C.O.B. provision to fulfill a number of specific functions. First, the provision was designed to avoid the problem of "over-insurance," which was described as a situation in which benefits collected from more than one plan produce a "profit" after all the bills are paid. Secondly, C.O.B. would enable the "insurance companies" to "work together" in paying up to 100% of an employee's allowable expenses. Finally, it was implied that this arrangement would benefit the employee because over-insurance "results in higher than necessary group insurance premium costs."
 
 
 26
 We have only to examine whether or not these purposes would be implemented by inclusion of the Mutual Benefit Fund to appreciate how unlikely it is that the Fund was comprehended within the terms of the collective bargaining agreement. The Mutual Benefit Fund is essentially an aggregate of Seminole members who participate in a benefit program more or less of their own making. The Fund was created by official union action, but only interested members contribute to it and enjoy its benefits, and these only to the extent that their monthly contributions of one dollar create a sufficient reserve to permit payments to the membership. The Fund was originally created for the very inauspicious purpose of avoiding gate and in-plant collections whenever a member of the Union fell ill and needed financial assistance. But the Fund is not a great deal more sophisticated than its progenitor. The maximum disability payment per man is $25.00 per week for a four week period.[4] The Union treasury may not be tapped for the benefit of the Fund, and if the Fund's reserves run out, payments stop until such time as they are built up again by the $1.00 a month contributions. The Fund is thus nothing more than a fraternal organization within the Union where sums are pooled by the contributors against possible future need. The Benefit Fund makes no profits and incurs no liabilities as an entity. It merely stores up funds as they are contributed and doles them out according to the organization's rules. In a sense, it is merely a collective savings account.
 
 
 27
 It is difficult to see how the coordination of benefits under the group insurance policy with such an arrangement fosters the purposes for which the C.O.B. clause was designed. Even if an employee receives both disability benefits under the group insurance policy and benefits of $25.00 per week from the Mutual Benefit Fund, it is unlikely that he will make a "profit." The insurance policy benefits amount only to about 50% of an employee's weekly wage.[5]
 
 
 28
 As for the possibility that the Fund can "work together" with the insurance company and thereby reduce the cost of insurance to an employee, we find this possibility so remote as to be unworthy of belief. Understandably an insurance company has an interest in benefit payments of other insurance companies or of programs like social security because the benefits from such programs can to some extent be actuarially related to the risks the company must take and hence to the premiums it must charge. But private, benevolent and fraternal payments are generally so uncertain in origin, and in such relatively small amounts, that the actuarials of insurance and loss premium ratios have little or no relation to them. In the case at bar Connecticut General was not even able to show how much savings resulted to the individual policyholder from the existence of the coordination of benefits provision as a whole, let alone what part of that savings was attributable to payments made by the Mutual Benefit Fund.
 
 
 29
 Finally it must be observed that the coordination of benefits between the insurance policy and the Mutual Benefit Fund produced the irrational consequence that an employee not a member of the Fund was receiving total benefits equivalent to an employee who was a member of the Fund. This inequality is not compatible with either reason or common sense. It presupposes that the Union on its part was indifferent to the effect which such coordination would have on a program established by its own members, and that United would consider such a situation acceptable to the Union. As Judge Brown noted in Motor Vehicle Casualty Co. v. Atlantic National Ins. Co., 5 Cir., 1967, 374 F.2d 601, 605, a court "ought always * * * to hesitate a little bit at least before making a pronouncement that the parties intended a senseless result."
 
 
 30
 The foregoing reasons persuade us that the collective bargaining agreement between Seminole and United was not intended to coordinate group disability insurance with the Mutual Benefit Fund. However, such reasons are not altogether dispositive of the Union members' claims for relief against the insurance carrier, Connecticut General. In the strictest sense Connecticut General was not a formal party to the terms of the ancillary letter agreement between United and Seminole, nor are the terms of the C.O.B. clause in the policy identical with the terms set forth in the collective bargaining agreement. Nonetheless, when the circumstances surrounding the issuance of the insurance policy are given their due weight, including United's obligation to adhere faithfully to its collective bargaining agreement, we think that the parties must have intended that the terms of the C.O.B. clause in the insurance policy be read in pari materia with the terms of the C.O.B. clause in the collective bargaining agreement.
 
 
 31
 As a preliminary to our discussion of the insurance policy itself we note sua sponte a possible jurisdictional problem. When a union and individual union members seek relief against an insurance carrier not their employer, is such an action any longer a suit for the violation of a contract between an employer and a labor organization as required by section 301 of the Labor Management Relations Act? In the only other case we are able to find involving a suit for the determination of rights to insurance coverage arising out of a collective bargaining agreement, the court found it unnecessary to reach and determine the rights of the union members in their insurance contracts. Upholsterers' International Union, etc. v. American Pad & Textile Co., 6 Cir. 1967, 372 F.2d 427. The same disposition was made by the district court below. In our view, however, the declaration of plaintiffs' rights in the collective bargaining agreement alone would not afford plaintiffs sufficient relief since Connecticut General would still be at liberty to interpret its insurance policy and to make deductions from benefits irrespective of any court decree construing the collective bargaining agreement.
 
 
 32
 It may be that the scope of § 301 is sufficiently broad to include within in its coverage the declaration of rights under insurance policies which arise out of the collective bargaining process. However, the present case does not call for such a determination since the power of the district court over Connecticut General is here supportable under the doctrine of pendent jurisdiction. Since it could not be said that the federal labor claim involved in this case was obviously without merit, or clearly foreclosed by prior Supreme Court decisions, or should have been dismissed on the pleadings alone without presentation of evidence, the fact that the claims under the insurance contract and the collective bargaining agreement originated in a "common nucleus of operative fact," gave the district court pendent jurisdiction over Connecticut General irrespective of the dimensions of § 301. United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218; Rumbaugh v. Winifrede Railroad Company, 4 Cir. 1964, 331 F.2d 530, cert. denied, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341; Jacobson v. Atlantic City Hospital, 3 Cir. 1968, 392 F.2d 149. Given the amount of judicial time and energy already expended in this case, we think the strong and practical policies undergirding the pendent jurisdiction doctrine require that in this instance the rights of union members in their group insurance policy be determined by a federal forum. United Mine Workers of America v. Gibbs, supra.
 
 
 33
 Interpretation of Connecticut General's group insurance policy in the present context is required only to the extent of determining whether or not the Mutual Benefit Fund was covered by the terms "union welfare fund" or "employee benefit plan."[6] Although the district court below did not reach and decide this issue, it was properly before the court on the basis of the pleadings, the pretrial stipulation, the interrogatories, and the contractual documents admitted into evidence. Since these materials permitted full development of the interpretation question in the district court and since they produced no factual disputes, this issue may properly be decided on the record before us. United States v. Mississippi Valley Generating Co., 1961, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268; Trent v. Atlantic City Elec. Co., 1964, 334 F.2d 847; In re Barnett, 1941, 124 F.2d 1005.
 
 
 34
 As already noted, the Mutual Benefit Fund was neither beneficiary of employer contributions nor of union contributions. It was entirely a voluntary union member plan supported only by the largess of individual union members. As such we find it was outside the ambit of the terms "employee benefit plan" and "union welfare fund." The term "employee benefit plan" we think is generally confined to employee plans of general application, i. e., plans in which all employees, not just a small segment of them, are entitled to participate, and plans, moreover, to which an employer usually makes contributions of his own. Cf. Blassie v. Kroger Company, 8 Cir. 1965, 345 F.2d 58.
 
 
 35
 "Union welfare funds" also generally involve employer participation. Cf. Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442; Lewis v. Mill Ridge Coals, Inc., E.D.Ky.1960, 188 F.Supp. 4, aff'd 298 F.2d 552; Budget Dress Corp. v. Joint Bd. of Dress and Waistmakers' Union of Greater New York, D.C.N.Y.1961, 198 F. Supp. 4, aff'd 299 F.2d 936, cert. denied, 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 56. However, even if such participation is not an essential, at the very least such funds should involve substantial union involvement. In the present instance the union as an entity has no direct financial stake in the Fund. Furthermore, the Fund is not only financially independent of the Union, it has its own rules, records and director. The most that can be said for Union involvement is that the Union acts as a collection agent or conduit for the Fund by passing on an extra one dollar a month in Union dues which are specifically collected from Fund participants. Such limited Union participation does not seem to justify the term "union welfare fund." At the very best, the applicability of such term to the Mutual Benefit Fund is uncertain and ambiguous. Where terminological doubt or ambiguity exists in an insurance contract, the general rule is that the doubtful term must be construed against the insurer. Rakoff v. World Insurance Co., Fla.App.1966, 191 So.2d 476, cert. denied, 201 So.2d 232. In the present context, such rule compels the finding that the Mutual Benefit Fund ought not to be coordinated with Connecticut General's group insurance policy.
 
 
 36
 Nothing in this result is meant to suggest that an insurance company and an employer may not coordinate insurance benefits with a program like the Mutual Benefit Fund if such is the clear and express intention of the parties. But where the insurer uses ambiguous terminology in its insurance policy, and where the employer in his agreement with the union includes purposes and language incompatible with the kind of coordination that is ultimately practiced, an expansive and novel reading of the coordination clause will not be presumed. In the present instance the plan sought to be pinioned within the contract's confines is not in the mainstream of labor-management-insurance company agreements for employee benefits. Coordination of such a plan must therefore depend upon the skill and linguistic exactitude of the contracting parties.
 
 
 37
 We reverse and remand for entry of judgment declaring: 1) that United is not in breach of its collective bargaining agreement with Seminole as a result of the terms of United's Master Insurance Contract with Connecticut General, 2) that the Master Insurance Contract issued by Connecticut General to United does not authorize the coordination of benefits with the Mutual Benefit Fund, and 3) that all deductions and withholdings made by either United or Connecticut General pursuant to a coordination of benefits between the Master Insurance Contract and the Mutual Benefit Fund were wrongful, and must be refunded to the individual plaintiffs, together with interest in the amount of six percent per annum from the time of the improper withholding and deducting.
 
 
 38
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C.A. § 185
 (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 * * * * *
 
 
 [2]
 Morgan Mooney, the personnel director of United Aircraft Corporation, stated that the union negotiators were told the following concerning "coordination of benefits":
 "It was pointed out orally * * * that the purpose of coordination of benefits is to provide that no employee who is a subscriber to a group insurance program in our plant and who may be a subscriber to other group insurance coverage somewhere else by reason of his having two jobs or by reason of his being a dependent, should make a profit on insurance because of having over-insurance. * * *"
 
 
 [3]
 Employees had to elect to participate in this insurance program and as a corollary thereof agree to pay approximately half the premiums
 
 
 [4]
 There was a brief period in which the Fund paid to each sick or disabled member as much as $50.00 per week for a four week period, but it quickly went broke. At the time of trial and for the greater part of its existence, the Fund has paid no more than $25.00 per week and limited benefits to $100.00 per year for each needy member
 
 
 [5]
 Disability Income Insurance
 Wage Regular Hourly Amount of Weekly
Class Base Rate Disability Income
 1 Less than $2.26 $44.00
 2 $2.26 but less than 2.51 49.50
 3 2.51 but less than 2.76 55.00
 4 2.76 but less than 3.01 60.50
 5 3.01 but less than 3.26 66.00
 6 3.26 but less than 3.51 71.50
 7 3.51 but less than 3.76 77.00
 8 3.76 but less than 4.01 82.50
 9 4.01 and over 88.00
 
 
 [6]
 Appellants admit that all other terms in the coordination of benefits clause are inapplicable to the Mutual Benefit Fund