**Mary E. BARGER**

v.

**PETROLEUM HELICOPTERS, INC., and Bell Helicopters International, Inc.**

**Civ. A. No. B–77–180–CA.**

United States District Court,
E. D. Texas,
Beaumont Division.

May 21, 1981.

Hubert Oxford, III, Benckenstein, McNicholas, Oxford, Radford, Johnson & Nathan, Beaumont, Tex., for plaintiffs.

Vance E. Ellefson, Lugenbuhl, Larzelere & Ellefson, New Orleans, La., for defendant Petroleum Helicopters, Inc., and intervenor American Home Assur. Co.

J. E. Williams, Jr., Fulbright & Jaworski, Houston, Tex., for defendant Bell Helicopters/Textron.

## MEMORANDUM OPINION [1]

JOE J. FISHER, District Judge.

Just after sunrise on the morning of April 23, 1976, the helicopter piloted by the Plaintiffs' decedent, Walter Barger, crashed into the Gulf of Mexico some 40 miles off the coast of Louisiana. Barger and all eleven of his passengers were killed. The

---

1. This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

Plaintiffs[2] brought this suit pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act, 46 U.S.C. § 761 et seq. (DOHSA), and the general maritime law to recover for Barger's death. The Defendants are Petroleum Helicopters, Inc. (PHI), Barger's employer and the owner of the helicopter, and Bell Helicopters/Textron (Bell), the helicopter's manufacturer. The cause of action against Bell is based on Texas tort law applicable in admiralty through DOHSA, see, e. g., *Fosen v. United Technologies Corp.*, 484 F.Supp. 490, 496 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980), and is pendent to the federal statutory and admiralty claims against PHI.[3] Trial was to the Court.

PHI is engaged in the business of transporting workers to and from drilling platforms in, among other places, the Gulf of Mexico off the coast of Texas and Louisiana. It maintains offices in Sabine Pass, Texas, and Cameron, Louisiana. Barger was employed by PHI as a pilot of one of its helicopters. On the day in question, Barger was operating a Bell 205A–1 PHI-owned helicopter bearing aircraft registration number N8167J from Cameron to a drilling rig owned by Blue Dolphin Corporation in the Gulf of Mexico. Barger was ferrying eleven Blue Dolphin employees to the rig. Approximately 40 miles offshore and 5 to 6 miles from the Blue Dolphin rig, the tail boom separated from the main body of the helicopter in flight, causing it to spin uncontrollably and crash into the Gulf.[4]

The tail boom separated when two of the four longeron fittings that attach the tail to the cabin failed. The evidence establishes that the upper left longeron fitting failed due to corrosion[5] and metal fatigue. The lower left longeron fitting failed immediately afterward, likewise due to corrosion and metal fatigue. Prior to the time of the crash, the two left fittings exhibited fatigue striations, which are marks on a fatigue fracture made by an advancing crack. The fatigue portions of the cracks were over an inch wide and an inch long in the upper left fitting and almost an inch and a half to an inch in the lower left. There were two cracks in each of the left longeron fittings. These cracks had been present for at least several hundred flight hours prior to the crash.

PHI had removed the tail boom from the helicopter in question three years and 3,747 flight hours prior to the crash. On reassembly, one of the bolts used was of an incorrect type and five of other fasteners were installed backwards.[6] Both the Bell

---

**2.** The Plaintiffs are Mary Elizabeth Barger, the widow, and Elizabeth Jane and Randy Michael Barger, the children.

**3.** The claims against Bell easily meet the requirements set out in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966), for the exercise of pendent jurisdiction: the federal claim must have sufficient substance to confer subject matter jurisdiction; the state and federal claims must derive from a common nucleus of operative fact; the nature of the plaintiffs' claims is such that they would ordinarily expect to try them all in one proceeding; and the decision to try the claims together must be justified by considerations of judicial economy, convenience, and fairness to the litigants. *See Connecticut General Life Ins. Co. v. Craton*, 405 F.2d 41, 48 (5th Cir. 1968). The exercise of discretion in favor of pendent jurisdiction is particularly appropriate in admiralty cases. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808–11 (2d Cir. 1971).

**4.** The evidence shows that the tail boom serves two very important functions: it acts as a counterweight to the main body of the helicopter, allowing the craft to fly on a level plane; and it provides sideways thrust through a tail rotor to overcome the tendency of the cabin to spin in a direction opposite to that of the blades. Therefore, when the tail boom separated from the cabin of Barger's helicopter, the cabin began to tumble forward and, at the same time, to spin at a rapid rate.

**5.** PHI operates its helicopters in a very corrosive, salt water and sea air environment.

**6.** The odd bolt was the closest to the fatigue area and of a slotted type, designed for use with a screwdriver. A gouge or nick was caused during installation when the screwdriver slipped from the head of this bolt and banged into the forging. The fatigue area spread, due to stress, from this gouge. Although the installation of incorrect and backward bolts would not have, alone, caused the fittings to fail, it is indicative of PHI's grossly inadequate maintenance program.

instruction manual and PHI's own inspection and maintenance procedures required that the longeron fittings be visually inspected every 100 flight hours. PHI had knowledge that there could be problems with these fittings in a corrosive environment by virtue of its having submitted to Bell nearly three years earlier a Malfunction Defect Report (MDR) along with a failed upper left fitting.[7] In early 1974, Bell reported to PHI the cause of the failure, and orally advised a PHI employee that its inspection procedures should be modified so as to more closely inspect the longeron fittings, without providing specific instructions on how to do so.

PHI is the largest commercial helicopter firm in the world and clearly has the requisite experience and expertise to properly inspect and maintain its helicopters. In particular, PHI's mechanics are experts in the field of helicopter repair and maintenance, are FAA certified, and should be held to the standard of an expert. *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 464, 465–66 (5th Cir. 1976). As such, PHI could have been reasonably expected to devise a proper method of inspecting the longeron fittings on its helicopters, despite the lack of formal instructions from Bell.[8] In fact, the National Transportation Safety Board inspector assigned to this crash found that, prior to the crash, PHI had in fact established a procedure to inspect these fittings. The failure of PHI's employees to discover the cracks and the gouge in the two left longeron fittings during one of the 100 hour inspections that took place while the cracks were in existence and visible for about 300 flight hours prior to the crash constitutes negligence, which was a contributing cause of the crash and the death of the Plaintiffs' decedent.

The evidence indicates that the tail boom of helicopters operating in a corrosive envi-

ronment should be completely removed and carefully scrutinized at no more than 1,000 flight-hour intervals.[9] Such an inspection would have readily disclosed the fatigue cracks in the left longeron fittings. The failure of PHI to remove the tail boom from Barger's helicopter for a period in excess of 3,700 flight-hours constitutes negligence, which was a contributing cause of the crash made the basis of this suit. PHI's negligence in failing to perform this type of inspection is particularly blameworthy, as it previously had knowledge of the tendency of the longeron fittings to fail in the environment in which its business is conducted.

■ The quantum of negligence required to impose liability under the Jones Act is very slight, and it need only be a contributing cause of the incident giving rise to the suit. *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 361 (5th Cir. 1980); *Reyes v. Vantage Steamship Co.*, 609 F.2d 140, 142 (5th Cir. 1980); *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir. 1977); *Bush v. Texaco, Inc.*, 504 F.Supp. 670, 672 (E.D.Tex. 1981). The Plaintiffs easily satisfied this featherweight burden.

■ The duty to provide a reasonably seaworthy vessel is absolute and is completely independent of the employer's obligation to exercise reasonable care. *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 327, 81 S.Ct. 6, 9, 5 L.Ed.2d 20 (1960); *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960). If, as the Plaintiffs contend, the helicopter, under the facts of this case, was a vessel within the meaning of the Jones Act and the general maritime law, then it is abundantly clear that it was not reasonably fit for its intended purpose and, therefore, unseaworthy. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971); *Mitchell*, 362

---

7. The evidence shows that the cause of the failure of the fitting that was the subject of the earlier MDR was mechanically identical to that of the upper left fitting on Barger's helicopter.

8. Prior to the accident, in addition to the oral warning noted above, Bell's maintenance manual called for a "thorough and searching" in-

spection of the helicopter, including the longeron fittings, every 100 hours of flight time.

9. This procedure is relatively simple to perform and takes approximately three hours to complete.

U.S. at 550, 80 S.Ct. at 933. The Court finds that such unseaworthy condition was a proximate cause of the crash.

■ The helicopter was in normal use at the time of the crash, and was in substantially the same condition as when it was sold to PHI by Bell in 1970. The helicopter was designed so that a part which is subjected to a great amount of stress, the upper left longeron fitting, was located in a position not readily accessible for inspection. The evidence at trial shows that Bell could have designed the 205A–1 to eliminate the joint requiring longeron fittings completely, used fittings made of steel or some other non-critical alloy, placed the fittings on the outside of the craft for easy inspection, or provided an easily removable inspection panel on the skin of the tail boom.

Moreover, the Court finds that the upper left longeron fitting, which is subject to more stress while underway than the other three fittings, was of insufficient strength and design for the use for which it is intended. The benefits, if any, from the use of longeron fittings as described above are heavily outweighed by the risks such design imposes upon the user of the product. *Turner v. General Motors Corp.*, 584 S.W.2d 844, 847 & n. 1 (Tex.1979). As designed, the Bell 205A–1 helicopter was defective and unreasonably dangerous within the meaning of section 402A of the Restatement (Second) of Torts (1965). *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 789 (Tex. 1967); *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 530 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Such defective design was a producing cause of the crash of April 23, 1976. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 & n. 3 (Tex.1977).

The evidence unequivocally shows that Barger in no way contributed to causing the accident. In addition, there was nothing he could have done after the tail boom separated to prevent the crash. The Court finds that, on the occasion in question, the Plaintiffs' decedent was not negligent.

■ The comparative fault of the Defendants will be assessed at 80% for PHI and 20% for Bell. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953); *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249 (5th Cir. 1979); *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 982 (5th Cir. 1978). Cf. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 407, 95 S.Ct. 1708, 1713, 44 L.Ed.2d 251 (1975).

In order for the Plaintiffs to recover under the Jones Act, 46 U.S.C. § 688,[10] they must show that Barger was a seaman. *Swanson v. Marra Brothers, Inc.*, 328 U.S. 1, 5, 66 S.Ct. 869, 871, 90 L.Ed. 1045 (1946); *Wixom v. Boland Marine & Manufacturing Co., Inc.*, 614 F.2d 956, 957 (5th Cir. 1980); *Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980); *Wilkerson v. Movible Offshore, Inc.*, 496 F.Supp. 1279, 1282 (E.D.Tex.1980). The Fifth Circuit has formulated a three-part test for determining whether a given employee is a seaman for purposes of the Jones Act:[11]

(1) he must have a more or less permanent connection with (2) a vessel in navigation and (3) the capacity in which he is employed or the duties which he performs

**10.** The Jones Act provides, in pertinent part, that

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.

**11.** A seaman for purposes of the Jones Act is also a seaman under the general maritime law and is, therefore, entitled to the warranty of seaworthiness. *Braen v. Pfeifer Oil Transportation Co., Inc.*, 361 U.S. 129, 132, 80 S.Ct. 247, 249, 4 L.Ed.2d 191 (1959); *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903).

must contribute to the function of the vessel, the accomplishment of its mission or its operation or welfare in terms of its maintenance during its movement or during anchorage for its future trips.

*Guidry v. South Louisiana Contractors, Inc.,* 614 F.2d at 452; *Guidry v. Continental Oil Co.,* 640 F.2d 523, 528 (5th Cir. 1981); *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir. 1959).

■ The question of seaman status is virtually always an issue of fact for the factfinder. *Gianfala v. Texas Co.,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955), *rev'ing per curiam* 222 F.2d 382 (5th Cir.); *Landry v. Amoco Production Co.,* 595 F.2d 1070, 1071 (5th Cir. 1979). Moreover, "[t]here is nothing in the [Jones Act] to indicate that Congress intended the law to apply only to conventional members of a ship's company." *Robison,* 266 F.2d at 780. Assuming for the moment that the helicopter in question was a vessel, there is no disputing that Barger had a more or less permanent connection with it. He had worked for PHI as a helicopter pilot from January of 1970 until his death. His was much more than a mere transitory relationship with PHI's fleet of crafts. *Ardoin v. J. Ray McDermott & Co.,* 641 F.2d 277, 281 (5th Cir. 1981); *Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 326 (5th Cir. 1977).

Similarly, there can be no doubt that Barger's duties contributed to the function of the vessel in the most essential way. PHI has admitted as much. He was its pilot, navigator, and sole crewmember. The third part of the test for seaman status has been satisfied. *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422, 433 n. 13 (5th Cir. 1977), *rev'd on other grounds,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

■ Now we come to the heart of this case: whether the helicopter was a vessel within the meaning of the Jones Act and the general maritime law. We start with the proposition that the Jones Act is remedial legislation and is to be broadly construed. *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 375, 53 S.Ct. 173, 175, 77 L.Ed. 368 (1932); *Spinks v. Chevron Oil Co.,* 507 F.2d 216, 224 (5th Cir. 1975); *Pure Oil Co. v. Suarez,* 346 F.2d 890, 895 (5th Cir. 1965), *aff'd,* 384 U.S. 202, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966). As Judge Wisdom wrote in *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir. 1959),

> There is no reason for lamentations. Expansion of the terms "seaman" and "vessel" are [*sic*] consistent with the liberal construction of the Act that has characterized it from the beginning and is consistent with its purposes.

*Id.* at 780.

■ The Bell 205A–1 helicopter involved in this case was equipped with pontoons, a life raft, and other life-saving apparatus. The pontoons were permanently affixed by Bell prior to sale to PHI and enabled the craft to land, take-off, float, and taxi on water. The helicopter lands on these rubberized floats each time it sets down, whether on land, on a drilling rig, or on water. There is no limitation on the distance a pontoon-fitted helicopter can taxi, but Bell recommends that this type helicopter not be operated where wave heights exceed 36 inches from trough to crest. Barger underwent extensive training on how to land, taxi, and take-off from water prior to being allowed to operate one of PHI's crafts.

The Merchant Marine Act of 1920,[12] of which the Jones Act is a part,[13] incorporates the definition of "vessel" contained in the Shipping Act of 1916,[14] as amended. This latter act provides as follows:

> The term "vessel" includes all water craft and other artificial contrivances of whatever description and at whatever stage of construction, whether on the stocks or launched, which are used or are

---

12. Act of June 5, 1920, ch. 250, §§ 1–39, 41 Stat. 988–1008.

13. Act of June 5, 1920, ch. 250, § 33, 41 Stat. 1007.

14. Act of September 7, 1916, ch. 451, §§ 1–36, 39 Stat. 728–38.

capable of being or are intended to be used as a means of transportation on water.

Act of September 7, 1916, ch. 451, § 1, 39 Stat. 728, as amended by the Act of July 15, 1918, ch. 152, § 1, 40 Stat. 900, now codified as 46 U.S.C. § 801. *See also* 1 U.S.C. § 3.[15] This definition encompasses "special purpose structures not usually employed as a means of transport by water but designed to float on water." *Robison,* 266 F.2d at 779. A helicopter equipped with permanently affixed pontoons is certainly an artificial contrivance capable of being used as a means of transportation and to float on water. However, the inquiry does not end there.

There is no hard and fast definition of vessel. As Judge Wisdom so aptly put it,

> Attempts to fix unvarying meanings have [*sic*] a firm legal significance to such terms as "seaman", "vessel", "member of a crew" must come to grief on the facts. These terms have such a wide range of meaning under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine their application in the circumstances of a particular case.

*Id.* at 779–80. Recent cases in the Fifth Circuit establish the rule that "[i]n determining what is a vessel, we consider the purpose for which the craft is constructed and the business in which it is engaged." *Blanchard v. Engine & Gas Compressor Services, Inc.,* 575 F.2d 1140, 1142 (5th Cir. 1978) [citing *The Robert W. Parsons,* 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903)[16]]; *Guidry v. Continental Oil Co.,* 640 F.2d at 529 n. 18; *Smith v. Massman Construction Co.,* 607 F.2d 87, 88 (5th Cir. 1979); *Hicks v.*

*Ocean Drilling & Exploration Co.,* 512 F.2d 817, 823 (5th Cir. 1975), *cert. denied sub nom. H. B. Buster Hughes, Inc. v. Ocean Drilling & Exploration Co.,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); *Cook v. Belden Concrete Products, Inc.,* 472 F.2d 999, 1001 (5th Cir.), *cert. denied,* 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973).

Barger's helicopter was constructed for the purpose of transporting men and material across the navigable waters of the Gulf of Mexico. The craft was specifically designed for landings, take-offs, and movement on water. Thus, the first prong of the analysis has been met.

As noted above, PHI is the largest commercial helicopter firm in the world. They are engaged almost exclusively in the business of transporting personnel to and from oil drilling platforms located in the territorial and navigable waters of the United States and other countries. There is no doubt that this is a traditional maritime activity and that Barger's helicopter was the functional equivalent of a crewboat.[17] *See Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 619 n. 2, 98 S.Ct. 2010, 2012 n. 2, 56 L.Ed.2d 581 (1978). The craft in question was engaged in a maritime endeavor sufficient to satisfy the second prong of our analysis.

Flotation on water does not alone qualify a given structure as a "vessel" for Jones Act purposes. The additional element of risk and exposure to the hazards of the sea must be present. *Hicks,* 512 F.2d at 823; *Atkins v. Greenville Shipbuilding Corp.,* 411 F.2d 279, 283 (5th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969). Barger and PHI's other pilots are certainly exposed to such hazards of the sea as

---

**15.** This statute similarly defines "vessel" as follows: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3.

**16.** The *Parsons* Court wrote that "neither size, form, equipment nor means of propulsion are determinative factors upon the question of jurisdiction, which regards only the purpose for which the craft was constructed, and the busi-

ness in which it is engaged." 191 U.S. at 30, 24 S.Ct. at 12.

**17.** PHI admitted in its post-trial memorandum that "the helicopter in question was performing a maritime activity traditionally performed by waterborne vessels, i. e. transporting personnel engaged in the exploration for petroleum and minerals on the Outer Continental Shelf, between platforms and vessels, over navigable waters."

drowning and storms, perhaps even to a greater degree than blue-water sailors.[18] *See Robison*, 266 F.2d at 780. When a PHI helicopter malfunctions in the way it did in this case, the pilot and passengers stand a far greater chance of losing their lives in the mishap than their counterparts aboard a traditional seagoing vessel.

In sum, the Court finds that, in the circumstances of this case, that the Bell 205A–1 helicopter piloted by Walter Barger was a vessel within the meaning of the Jones Act and the general maritime law of the United States, and that Barger was a seaman.

■ PHI vigorously maintained throughout the trial that Barger was not a seaman but a longshoreman and, therefore, subject to the provisions of the Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. (LHWCA). Yet, section 905(b) of the LHWCA gives an injured longshoreman the right to bring an action against the vessel owner for negligence.[19] The circumstance that the vessel owner and the employer are the same entity does not preclude such an action. *Smith v. M/V Captain Fred*, 546 F.2d 119, 123 (5th Cir. 1977).[20] While adhering to the finding that the helicopter in this case was a vessel, the Court finds, in the alternative, that should Barger be a longshoreman, the Plaintiffs have proved ample negligence

and causation to support recovery against PHI under section 905(b) of the LHWCA.

The Court allowed PHI to amend its answer some two years after this action was commenced in order to assert its right to limit its liability to the value of the vessel and pending freight at the end of the voyage, pursuant to the Limitation of Liability Act, 46 U.S.C. § 181 et seq. (Limitation Act). Although the procedures outlined in section 185 of the Limitation Act were not followed, the law is settled that limitation of liability may be pled by way of answer, in which case the requirements of section 185 do not apply.[21] *Murray v. New York Central R.R. Co.*, 287 F.2d 152, 153 (2d Cir.), *cert. denied*, 366 U.S. 945, 81 S.Ct. 1674, 6 L.Ed.2d 856 (1961); *Deep Sea Tankers, Ltd. v. The Long Branch*, 258 F.2d 757, 772 (2d Cir. 1958), *cert. denied*, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 (1959); *The Chickie*, 141 F.2d 80, 84 (3d Cir. 1944); *Signal Oil & Gas Co. v. The Barge W–701*, 468 F.Supp. 802, 813 (E.D.La.1979). *But see Odegard v. Quist*, 199 F.Supp. 449, 451–52 (E.D.N.Y. 1961).

■ Yet, the Limitation Act will not operate in this case to PHI's benefit. Section 183 provides, in pertinent part, that:

The liability of the owner of any vessel ... for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowl-*

---

**18.** Barger's body was lost at sea and never recovered.

**19.** The relevant portion of the statute provides that:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title.

33 U.S.C. § 905(b).

**20.** The House Report accompanying the 1972 amendments to the LHWCA supports this proposition:

The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme

Court, in *Reed v. S. S. Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) and *Jackson v. Lykes Bros. Steamship Co.*, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967), held that the unseaworthiness remedy is available to the injured employee. The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor.

H.R.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4705 (footnotes omitted).

**21.** Section 185 requires that the petition to limit liability be filed within 6 months of notice of a claim, and the vessel owner must deposit the value of the vessel into the registry of the court or with a trustee appointed by the court.

*edge of such owner or owners*, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C. § 183(a) (emphasis supplied). For its own fault and neglect, the vessel owner remains subject to full liability. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 205, 88 S.Ct. 379, 387, 19 L.Ed.2d 407 (1967); *American Car & Foundry Co. v. Brassert*, 289 U.S. 261, 264, 53 S.Ct. 618, 619, 77 L.Ed. 1162 (1933). Moreover, the vessel owner has the burden of proving the absence of privity and knowledge. *Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943).[22]

The terms "privity" and "knowledge" are nowhere defined in the Limitation Act. The Supreme Court has written that "[p]rivity, like knowledge, turns on the facts of particular cases."[23] *Coryell*, 317 U.S. at 411, 63 S.Ct. at 293; *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975). The abundance of fault shown on the part of supervisory personnel of the corporate vessel owner brings this case within the exception to the Limitation Act. One of PHI's three vice presidents, a Mr. Tysdale, admitted from the witness stand that he knew of the previous upper left longeron failure that occurred in 1973 and of the tendency of this part to fail in a salt water environment. He testified that, despite this knowledge, PHI did not make any changes in its monthly inspection procedures to more closely scrutinize this crucial area. He testified that PHI relied on Bell for its maintenance and inspection procedures and up-dates.

Privity and knowledge are deemed to exist where the owner had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection. Knowledge or privity of supervisory shore personnel is sufficient to charge a corporation. *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966), *cert. denied*, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). The Court finds that PHI failed to carry its burden of proof by a preponderance of the evidence. The facts of this case show neglect on the part of PHI more than sufficient to satisfy the definition of privity and knowledge.

■ The Court has previously found that the vessel was in an unseaworthy condition. The Court now finds that PHI did not discharge its burden of showing the exercise of due diligence to ascertain the craft's seaworthiness. This, alone, is sufficient ground for denying PHI's petition to limit its liability under the Limitation Act. *The Malcolm Baxter, Jr.*, 277 U.S. 323, 331, 48 S.Ct. 516, 517, 72 L.Ed. 901 (1928); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A.*, 388 F.2d 434, 439 (2d Cir.), *cert. denied*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968). PHI is not entitled to limit its liability.[24]

22. "It seems reasonable that the shipowner who invokes the Limitation Act, should bear the burden of proving the absence of privity and knowledge: as to that branch of the case he is the moving party and the facts are peculiarly within his knowledge." G. Gilmore & C. Black, *The Law of Admiralty*, § 10–25 at 895–96 (2d ed. 1975). The burden is initially on the injured party, however, to prove negligence or unseaworthiness. *In re Brasea, Inc.*, 583 F.2d 736, 738 (5th Cir. 1978).

23. Professors Gilmore's and Black's formulation is more colorful: those terms "are empty containers into which the courts are free to pour whatever content they will." G. Gilmore & C. Black, *The Law of Admiralty*, § 10–20 at 877 (2d ed. 1975).

24. It may well be that the helicopter, although a vessel for Jones Act purposes, is not a vessel for purposes of limitation of liability. This is so because, while the Jones Act is to be broadly interpreted, *see, e. g., Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 375, 53 S.Ct. 173, 175, 77 L.Ed. 368 (1932), the Limitation Act is construed narrowly. *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 437, 74 S.Ct. 608, 622, 98 L.Ed. 806 (1954) (Black, J., dissenting); *Rowe v. United States Fidelity & Guaranty Co.*, 375 F.2d 215, 219 (4th Cir. 1967); *In re Chinese Maritime Trust, Ltd.*, 361 F.Supp. 1175, 1178 (S.D.N.Y.1972), *aff'd*, 478 F.2d 1357 (2d Cir. 1973), *cert. denied sub nom. Chinese Maritime Trust, Ltd. v. Panama Canal Co.*, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974).

■ Walter Barger was 47 years old at the time of his death and had a work-life expectancy of 17.068 years and a life expectancy of 26.69 years. At the time of his death he was earning $15,230.00 per year base pay from PHI. The evidence shows that he was a very competent pilot and that he would have been promoted pursuant to the PHI seniority system ahead of those pilots with less seniority than he. His lost earnings from the time of his death to trial, allowing for personal consumption and income tax, were established to be $62,810.00.

■ The salaries of Barger's contemporaries at PHI grew prior to trial at the rate of 17.65%.[25] The appropriate discount rate is 6.97%. Applying these two rates to Barger's yearly salary and allowing for income tax,[26] 20% personal consumption, and 12% business-related expenses, the Court finds the lost earnings in the future to be $575,468.00.

■ The evidence adduced at the trial indicates that Walter Barger was extremely helpful around the house. He performed such services for his family as repairing automobiles, air conditioners, refrigerators, lights, bathrooms, and the like. The Court finds that the loss of household services over Barger's life expectancy, discounted at 6.97%, amounts to $22,090.00.

■ Neither DOHSA nor the Jones Act allow recovery of damages for loss of society where a seaman's death occurs on the high seas. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 622, 98 S.Ct. 2010, 2013, 56 L.Ed.2d 581 (1978) (DOHSA); *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524, 529 (5th Cir. 1979) (en banc), *cert. denied*, 446 U.S. 956, 101 S.Ct. 27, 65 L.Ed.2d 1173 (1980) (Jones Act).[27] The Court concludes that the Plaintiffs should not recover any damages for loss of society.[28] The two children, Elizabeth Jane and Randy Michael Barger, are, nevertheless, entitled to recover for "the loss of that care, counsel, training and education which [they] might, under the evidence, have reasonably received from [Walter Barger], and which can only be supplied by the service of another for compensation." *Michigan Central R.R. Co. v. Vreeland*, 227 U.S. 59, 71, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913). This item is recoverable both under the Jones Act, *id.; Higginbotham v. Mobil Oil Corp.*, 360 F.Supp. 1140, 1149 (W.D.La.1973), *aff'd in part, rev'd in part*, 545 F.2d 422 (5th Cir. 1977), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), and under DOHSA. *Solomon v. Warren*, 540 F.2d 777, 789 (5th Cir. 1976), *cert. dism'd sub nom. Warren v. Serody*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

The evidence shows that Walter Barger was a loving husband and father who assisted and advised his children in their studies and their lives. The Court, therefore, finds that Elizabeth Jane Barger, who was 18 years old but living at home at the time of her father's death, should be awarded $10,000.00 for the loss of her father's nurture, counsel, and guidance. The Court further finds that Randy Michael Barger, who was 15 at the time of his father's death, should also be awarded $10,000.00 for his loss of nurture, counsel, and guidance.

**25.** Any increase in growth due to inflation was excluded from this figure by the Plaintiffs' economist. *See Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422, 434–35 (5th Cir. 1977), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *Johnson v. Penrod Drilling Co.*, 510 F.2d 234, 241 (5th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975).

**26.** The Court will recognize the current income tax tables found in 26 U.S.C. § 1 as a fair estimate of the taxes that would have been paid by the Plaintiffs' decedent in the future. *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

**27.** Quite incongruously, loss of society damages are recoverable where the injury or death is caused by unseaworthiness in territorial waters. *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980); *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

**28.** Loss of society damages encompass love, affection, care, attention, companionship, comfort, and protection. *Gaudet*, 414 U.S. at 585, 94 S.Ct. at 814.

The Plaintiffs seek an award for the loss of various "fringe benefits" that Barger would have received from PHI in addition to his salary had he not been killed. No evidence was presented at the trial from which the Court can ascertain a specific amount for the loss of fringe benefits. Due to this lack of evidence, the Court will decline to award any sum for this element.

Another item of damages sought is the loss of Barger's naval retirement pay.[29] It appears that Barger made an election to receive a greater amount of monthly pay, which would cease upon his death, rather than to receive a reduced amount and provide for his wife by way of an annuity after his death, pursuant to 10 U.S.C. § 1431. If Barger had intended that his family would receive the benefit of his naval retirement, he would have made such an election under the statute. The Court will make no award for this item of damages.

The final element of damages sought by the Plaintiffs is an award for Barger's conscious pain and suffering during the interval between the time the helicopter began to spin and tumble uncontrollably until it hit the water. According to a Mr. Messer, ten to fifteen minutes after sunrise on the day of the crash, he heard a Mayday and someone crying for help over his radio. The testimony shows that PHI's pilots normally operated their crafts at 500–800 feet above the surface of the water. At that height, it would have taken Barger's helicopter approximately ten seconds to hit the water. Moreover, due to the violent spinning and tumbling, it is doubtful that Barger or his passengers would have been alive all the way to the water.

■ There can be no award for conscious pain and suffering where the decedent was in all probability rendered immediately unconscious as a result of his injuries. *Mpiliris v. Hellenic Lines, Ltd.*, 323 F.Supp. 865, 894 (S.D.Tex.1970), *aff'd*, 440 F.2d 1163 (5th Cir. 1971). Where the immediacy of the injuries and the absence of specific evidence renders too speculative a finding that the decedent consciously suffered pain, any award for this element would be improper. *In re Dearborn Marine Service, Inc.*, 499 F.2d 263, 288 (5th Cir. 1974), *cert. denied*, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). The evidence of the violent gyrations of his craft indicates that it was more likely than not that Barger was rendered unconscious immediately. Therefore, the claim for conscious pain and suffering will be denied.

■ American Home Assurance Company, PHI's workers' compensation carrier, has paid the sum of $26,403.72 to Mrs. Barger as death benefits under the LHWCA. PHI is entitled to credit this sum against its portion of the judgment.

■ In admiralty cases, an award of prejudgment interest is the rule rather than the exception. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 175 (5th Cir. 1979). Although not proper in a pure Jones Act case, this rule applies where suit is also brought, as here, in admiralty. *Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir. 1972). Where such an award is denied, the trial court must detail the factual basis for the denial. *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1217 (5th Cir. 1980); *Dow Chemical Co. v. M/V Gulf Seas*, 593 F.2d 613, 614 (5th Cir. 1979). The Court can find no ground for denial of prejudgment interest in this case and will direct that the award will bear interest from the date of the crash to the date of entry of the judgment. *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 988 (5th Cir. 1978); *In re M/V Vulcan*, 553 F.2d 489, 490–91 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).

■ Although it would appear that the Court has the discretion to award prejudgment interest at a rate in excess of the statutory rate, *id.* at 491, it will decline the Plaintiffs' invitation to do so. The award will bear interest at the analogous Texas statutory rate, *Geotechnical Corp. v. Pure*

29. Walter Barger was a retired submariner, a seaman by profession.

*Oil Co.*, 214 F.2d 476, 478 (5th Cir. 1954), of 6% per annum [30] from the date of the injury, April 23, 1976, to the date of entry of the judgment. Naturally, the judgment will bear interest at the rate of 9% per annum [31] until paid. 28 U.S.C. § 1961.

The amount of the total judgment in favor of Mary Elizabeth Barger, individually and as personal representative of the estate of the decedent, will be $660,368.00 plus prejudgment interest. Bell is liable for 20% of this sum, or $132,073.60. PHI is liable for the remaining 80%, after crediting the amount of the aforementioned LHWCA benefits, or $501,890.68. Randy Michael Barger and Elizabeth Jane Barger are each entitled to $8,000.00 from PHI and $2,000.00 from Bell, plus prejudgment interest.

Neither PHI nor Bell are entitled to contribution or indemnity from the other. *Culver v. Slater Boat Co.*, 644 F.2d 460, 466 (5th Cir., 1981); *Wedlock v. Gulf Mississippi Marine Corp.*, 554 F.2d 240, 243 (5th Cir. 1977). In accordance with the rules set out in *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1248 (5th Cir. 1979), the settlement achieved by Bell relieves it of any further liability to the Plaintiffs and PHI is liable for the entire judgment after crediting the dollar amount represented by the percentage of fault attributed to Bell. Rather than reward a defendant for its refusal to settle, no credit will be allowed to PHI for the difference between the amount of Bell's settlement and the amount represented by Bell's percentage of fault.[32] *Id.* at 1251. Costs will be assessed against PHI.

The Court recognizes that today's finding that the helicopter was a vessel is a departure from the traditional concept of a vessel. The result it reaches today is no more strange than the Fifth Circuit cases holding that movible offshore drilling platforms are vessels for Jones Act purposes, while fixed platforms are not. *See, e. g., Longmire v.*

*Sea Drilling Corp.*, 610 F.2d 1342, 1348 (5th Cir. 1980).

The absence of any legislative restriction has enabled the law to develop naturally along with the development of unconventional vessels, such as the strange-looking specialized watercraft designed for oil operations offshore and in the shallow coastal waters of the Gulf of Mexico. *Robison*, 266 F.2d at 780. Workers on movible platforms are seamen even though the rigs are jacked-out of the water and not at all vessel-like when an injury occurs. *Id.* at 772. There is, indeed, no reason for lamentations. Expansion of the law is required to adapt to changes in our environment and in the way we live our lives, and is consistent with the humanitarian purposes of the Jones Act and other laws protecting those who encounter the hazards of the sea.

*It is so ordered.*

---

30. Tex.Rev.Civ.Stat.Ann. art. 5069—1.03 (Vernon Supp. 1980).

31. *Id.*, art. 5069—1.05.

32. Bell settled its portion of the case with the Plaintiffs immediately prior to trial for $225,000.00. Bell's part of the judgment would otherwise have been $134,073.60.