908 F.2d 1252
 135 L.R.R.M. (BNA) 2267, 116 Lab.Cas. P 10,252,
12 Employee Benefits Ca 2097
 UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and
its Local No. 1305, J.W. Boelsche, Bobby K.
Oglethorpe, and Lewis A. Stadler,
Plaintiffs-Appellants,
v.
CHAMPION INTERNATIONAL CORPORATION, Defendant-Appellee.
 No. 89-6055.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 16, 1990.
 
 Louis L. Robein, Jr., Gardner, Robein & Urann, Metairie, La., Michael Hamilton, Nashville, Tenn., and Bruce Fickman, Fickman & Van Os, Houston, Tex., for plaintiffs-appellants.
 L. Chapman Smith, Carol Helliker, Paul L. Mitchell, and Gloria Salinas, Baker & Botts, Houston, Tex., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, JOHNSON, and SMITH, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 United Paperworkers International Union, its local affiliate, and three retired union members brought this class action against Champion International Corporation, alleging breach of a collective bargaining agreement in violation of 29 U.S.C. Secs. 185(a) and 1132 and seeking damages and injunctive relief. The district court entered a take-nothing judgment from which plaintiffs appeal. We reverse and remand.
 
 I.
 
 2
 In the spring of 1986, the United Paperworkers International Union and Champion International Corporation entered into a collective bargaining agreement to deal with plant restructuring at the company's mill in Pasadena, Texas. The agreement, ratified by the union membership in May 1986, included an early retirement plan, under which employees retiring on or after June 1, 1986, could continue to receive group medical insurance coverage until age 65 through authorized monthly premium deductions from their pension checks. The monthly premium was to be $15.50. When asked during negotiations what the basis was for this premium figure, the company representative said that it was equal to the Medicare Part B premium.
 
 
 3
 The agreement refers in several places to medical coverage for early retirees. In particular, exhibits 1 and 6 to the agreement, incorporated by reference, discuss medical premiums. Exhibit 1, entitled "Benefits for Employees Affected by the Mill Restructuring," provides that early retirees have to make contributions of $15.50 per month per covered individual for health insurance, and it refers the reader to the insurance plan itself for specific coverage.
 
 
 4
 Exhibit 6, entitled "Revised Medical Plan--Coverage After Retirement," provides in pertinent part,
 
 
 5
 A monthly contribution of $15.50* will be required for each covered individual until that individual reaches age 65. For example, coverage for a retiree and spouse while both are under age 65 would require a contribution of $31.00* per month. If the retiree reaches age 65 but the spouse has not, the contribution for the spouse would be $15.50* per month until the spouse also becomes age 65 years old.
 
 
 
 *
 Contributions for the retiree medical plan are equal to the Medicare Part B premium.
 
 
 
 6
 Additionally, the deduction authorization signed by each retiree enrolling in the revised medical insurance program contains the following language: "I understand that the cost per month per covered individual under age 65 will be equivalent to the Medicare Part B premium."
 
 
 7
 In early 1987 the company sold its Pasadena plant to Simpson Pasadena Paper Company. On February 3, 1987, the union and the company entered into an Effects of Sale Agreement that terminated the May 1986 collective bargaining agreement but did not say anything about the May 1986 retirees. Until the end of 1987, the May 1986 retirees continued to receive medical insurance coverage at a monthly cost of $15.50.
 
 
 8
 As of January 1, 1988, the company increased the monthly premiums to $24.80 for each covered individual under age 65; this increase corresponded to an increase in the Medicare Part B premium. As of January 1, 1989, the company further increased the monthly premium to $31.90 to correspond to another Medicare Part B increase. An earlier Medicare Part B premium increase in 1987 had not resulted in an accompanying increase in the retirees' premium.
 
 
 9
 In March 1988 the union, its local affiliate, and three retired employees (collectively, the "union") brought this action against the company in the district court a quo. The court granted the union's motion for class certification in December 1988. The union alleged that the company breached the 1986 collective bargaining agreement and violated the Employee Retirement Income Security Act of 1974 (ERISA) by increasing the retirees' medical insurance premiums. It sought monetary damages and a permanent injunction.
 
 
 10
 The company moved for summary judgment. After a hearing, the court granted the motion, concluding that the collective bargaining agreement unambiguously provided that the retirees' premium would track the Medicare Part B premiums, varying exactly as the Medicare Part B premium changed.
 
 II.
 
 11
 The union maintains that the collective bargaining agreement did not permit increases in the medical insurance premium of the May 1986 Pasadena plant retirees. It argues that it submitted sufficient evidence in the form of affidavits and various documents to present a genuine dispute as to the material fact of whether the collective bargaining agreement permitted such increases. Thus, it asserts, summary judgment should not have been granted.[1]
 
 
 12
 The company argues that the construction of the collective bargaining agreement is a question of law and that the sole issue on appeal is whether the district court correctly construed that agreement. It maintains that that agreement unambiguously provided for an increase in the retirees' medical insurance premium whenever the Medicare Part B premium increased and that therefore the company's actions in accordance with this construction did not breach the agreement.
 
 A.
 
 13
 The company first asserts that the union has waived the right to argue that the collective bargaining agreement was ambiguous because it did not make that argument in its opening brief. The company correctly states the general proposition that any issues not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal. See In re Tex. Mortgage Servs. Corp., 761 F.2d 1068, 1073-74 (5th Cir.1985). Moreover, an appellant abandons all issues not raised in its initial brief. Piney Woods Country Life School v. Shell Oil Co., 905 F.2d 840, 854 (5th Cir.1990); Nissho-Iwai Co. v. Occidental Crude Sales, Inc., 729 F.2d 1530, 1539 n. 14 (5th Cir.1984).
 
 
 14
 Although the union does not say expressly in its original brief that the collective bargaining agreement was "ambiguous," the premise of its argument is that the agreement was subject to two reasonable interpretations. The company's interpretation is that the retirees' insurance premium was to increase as the Medicare Part B premiums increased; the union's view is that the retirees' insurance premium was to remain fixed at $15.50 per month. The union asserts that the evidence it submitted in opposition to the summary judgment motion showed that the company's interpretation was not the only reasonable one, since the evidence raised a genuine issue of material fact--the parties' intent as to the amount of the insurance premium.
 
 
 15
 A contract is ambiguous if it is reasonably susceptible to more than one interpretation. International Bhd. of Boilermakers v. Local Lodge D111, 858 F.2d 1559, 1561 (11th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989); Richland Plantation Co. v. Justiss-Mears Oil Co., 671 F.2d 154, 156 (5th Cir.1982) (interpreting Texas law). Since the union argues essentially that the collective bargaining agreement is reasonably susceptible to two meanings, it is asserting ambiguity. Hence, it has not waived or abandoned its claim that the collective bargaining agreement is ambiguous.
 
 B.
 
 16
 The union brought this suit against the company under section 301(a) of the Labor Management Relations Act, 29 U.S.C. Sec. 185(a),[2] which allows federal district courts to entertain suits for violation of contracts between an employer and a labor organization. Federal substantive law governs the interpretation and enforcement of collective bargaining agreements under section 301(a). See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). Moreover, "state law, if compatible with the purpose of section 301, may be resorted to in order to find the rule that will best effectuate the federal policy." Id. at 457, 77 S.Ct. at 918. Another circuit has explained, citing Textile Workers, that "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984); see also Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1517 (8th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).
 
 
 17
 However, the construction and application of a collective bargaining agreement's terms cannot be strictly confined by ordinary principles of contract law. Smith v. Kerrville Bus Co., 709 F.2d 914, 917 (5th Cir.1983); NLRB v. L.B. Priester & Son, Inc., 669 F.2d 355, 365 (5th Cir.1982). The provisions of a labor contract may be more readily expanded by implication than those of contracts memorializing other transactions. Smith v. Kerrville Bus Co., 709 F.2d at 917.
 
 
 18
 The parties do not identify, and we have not found, any federal labor policy favoring or disfavoring fixed health insurance premiums for retirees. Therefore, we apply traditional rules of contract interpretation to determine whether the collective bargaining agreement provides for a fixed premium, keeping in mind the flexibility accorded the application of those rules in the context of labor contracts.
 
 
 19
 The interpretation of a collective bargaining agreement, as with any contract, is typically a question of law. Smith v. Kerrville Bus Co., 799 F.2d 1079, 1081 (5th Cir.1986). The determination of whether a contract is ambiguous in order to permit extrinsic evidence of intent is also a question of law. Richland Plantation Co., 671 F.2d at 156 (interpreting Texas law). A contract is ambiguous when, after applying established rules of construction, "it is reasonably susceptible to more than one meaning." Id.
 
 
 20
 If the court finds the contract to be ambiguous, the determination of the parties' intent becomes a question of fact, and extrinsic evidence of intent may be introduced. Id. When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, and the court should attempt to give effect to every contractual provision. Id.; see also Yard-Man, Inc., 716 F.2d at 1479-80. A contract found to be ambiguous should be construed more strictly against the party who drafted it (in this case, the company). Richland Plantation Co., 671 F.2d at 156.
 
 
 21
 The company argues that the collective bargaining agreement, read as a whole, evinces an intent to tie the retirees' premium to the Medicare Part B premium so that it would vary as the Medicare Part B premium varies. The company asserts that use of the word "equal" in exhibit 6 implies the use of one amount, the Medicare Part B premium, as the measure of another, the retirees' premium.
 
 
 22
 Indeed, construing the collective bargaining agreement in conjunction with the enrollment form lends weight to this interpretation, as the enrollment form makes no mention of any specific sum, saying only that the cost per month will be equivalent to the Medicare Part B premium. Moreover, if the parties did not intend to vary the retirees' premium with the Medicare Part B premium, the inclusion of the language in exhibit 6 referring to the Medicare Part B premium contributes nothing to the legal effect of the contract, which makes it more difficult for us to follow our rule of construction that attempts to give effect to every term in the contract.
 
 
 23
 In response, the union contends that if the parties had intended the retirees' premium always to match the Medicare Part B premium, they would have phrased the collective bargaining agreement differently to emphasize the correspondence to the Medicare Part B premium and only secondarily would have stated that the current amount was $15.50 per month. According to the union, the mention of Medicare Part B is merely a reference to the source of the $15.50 figure.
 
 
 24
 While the inclusion in a contract of a source reference, where not specifically designated as such, might seem unlikely, it is made more plausible by the fact that the reference to "Medicare Part B" was set off in a footnote whose marker followed "$15.50" in the text of the contract. Furthermore, while the individual enrollment forms might be part of the contract for ERISA purposes,[3] they are only extrinsic evidence of intent as to the contract for purposes of section 301.[4]
 
 
 25
 Accordingly, the enrollment forms cannot be used in support of the company's contention that the collective bargaining agreement unambiguously provides for a variable premium matching the contemporaneous Medicare Part B premium. Those forms can be used to interpret the agreement only if the court first determines that the agreement is ambiguous. Then the enrollment forms can be admitted on the factual question of intent along with other extrinsic evidence as to the same.
 
 
 26
 Ultimately, to any claim by the company that the designation of the monthly premium as "equal to" the Medicare Part B premium unambiguously implies that the retirees' premium at any given time in the future must match the Medicare Part B premium, the union can answer that "equal to" the Medicare Part B premium means equal to the Medicare Part B premium at the time of the contract's drafting, not equal to some variable future amount. Therefore, we find the collective bargaining agreement ambiguous on its face.
 
 
 27
 Furthermore, we extend this determination to the ERISA agreement even if the enrollment forms are part of that agreement. While the inclusion of the enrollment form as part of the agreement might make the company's interpretation of the agreement seem more likely from the face of the document, the agreement still is ambiguous. The enrollment form, were it the entire contract, might suggest, with sufficient clarity to obviate the need to turn to extrinsic evidence, that the retirees' premium was to vary with the Medicare Part B premium. However, given that we must construe the enrollment form in conjunction with the other documents that repeatedly state that the retirees' premium will be "$15.50," with the Medicare Part B premium mentioned but once and in a footnote, we conclude that the ERISA agreement is ambiguous.
 
 
 28
 Therefore, appellants have raised a genuine issue of material fact as to the meaning of the agreements, and the court erred in its determination that those agreements were unambiguous. Accordingly, we reverse in order that the factfinder can make appropriate determinations of the parties' intent by considering extrinsic evidence.[5]
 
 III.
 
 29
 In addition to arguing that the agreement was unambiguous, the company advances two independent grounds on which, the company maintains, we could properly affirm the grant of summary judgment. We address these in turn.A.
 
 
 30
 The company first asserts that there was no "meeting of the minds" between the parties with respect to the amount of the retirees' medical insurance premium. Consequently, the company continues, no contract was formed as to that subject, and thus there was no contract to be breached by increasing the premium. Because the parties had different understandings of the agreement, did not disclose their respective positions, and did not have any reason to know of the different interpretations, the company claims there was no meeting of the minds. See Murphy v. Gutfreund, 583 F.Supp. 957, 962 n. 6 (S.D.N.Y.1984). The district court rejected this argument without making any findings with respect to the parties' differing intent, because it found the contract language unambiguously indicated their intent.
 
 
 31
 We first observe that the "meeting of the minds" doctrine in Murphy, as well as under our own interpretation of federal labor law and Texas law, more often has been addressed to the question of whether there is a contract at all, rather than to whether the parties' minds met on how what would otherwise undeniably be an enforceable contract would address a particular contingency arising under that agreement.[6] Next we note that in the case before us, the collective bargaining agreement plainly contemplates the retirees' paying some premium for health insurance until reaching age 65.
 
 
 32
 Moreover, the agreement nowhere defers the determination of the amount of the premium to some later negotiations or agreements. Therefore, because the agreement specifically addressed the amount of the premium to be paid by retirees until they reach age 65 (which for some will not occur for several years), we easily conclude that both parties intended that the agreement designate completely what the retirees' future premium would be. We can ascertain this much from the face of the agreement, and neither party suggests anything to the contrary.[7]
 
 
 33
 In determining whether there was a meeting of the minds, the parties' objective, rather than subjective, intent governs.[8] Thus, when the company asserts an absence of any meeting of the minds with regard to what would be the amount of premium payments when the Medicare Part B premium changed, it could be alleging one of two different things: either (i) that the parties never gave any objective indication of having contemplated any change in the Medicare Part B premiums and thus this change was an unanticipated contingency, or (ii) that, while the parties, by objective manifestations, did consider the possibility of a change in the Medicare Part B premium, they had different understandings as to how the agreement as drafted provided for that contingency.[9]
 
 
 34
 If extrinsic evidence suggests that the parties thought they had reached a mutual understanding on this issue, but in actuality had different subjective impressions as to the meaning of the contract that memorialized their agreement, then the court will look to objective manifestations of intent to give effect to the agreed-upon provision. Where objective manifestations of intent indicate that the parties foresaw the contingency of a change in the Medicare Part B premium, it is unlikely that the parties' positions were entirely undisclosed or that they had no reason to know of differing interpretations of the agreement on this issue. Objective manifestations of intent will probably support one party's interpretation more than the other's.[10]
 
 
 35
 Because we have determined that the agreement is ambiguous as a matter of law and might support either party's interpretation, we cannot determine whose interpretation the objective manifestations support without reference to extrinsic evidence of intent. Therefore, in this instance, we must leave it to the finder of fact to discern on what terms the minds met.
 
 
 36
 If examination of extrinsic evidence of objective intent instead shows that the parties never contemplated a rise in the Medicare Part B premium, we would reach a similar conclusion. Where both parties to a collective bargaining agreement intended to set a rate for the retirees' premium and simply did not anticipate a contingency (a change in the Medicare Part B premium) that would make the contract ambiguous, the court will act properly by interpreting the contract's ambiguous terms rather than declaring them a nullity merely because of some uncertainty in meaning.[11] In making this statement about contract interpretation, we rely specifically upon two of our prior decisions interpreting collective bargaining agreements.
 
 
 37
 In Connecticut Gen. Life Ins. Co. v. Craton, 405 F.2d 41, 45-46 (5th Cir.1968), we stated,
 
 
 38
 We are urged to accept the thesis that because the specifics of deductibles ... were not on the negotiating agenda or specifically dealt with, there was no meeting of the minds. Yet many contractual disputes arise out of phraseology without the benefit of verbal preludes or prefaces. Contractual negotiations do not always address themselves to the minutiae of contracts....
 
 
 39
 ... Contracting parties being less than sibylline do not always cast their contracts in a prophetic mold. Not only are parties to a contract often incapable of foreseeing all contingencies, but there are even occasions, and we would include among them many collective bargaining agreements, where statements of general purpose tend to smooth the way toward consensual harmony where the elaboration of detail would only destroy it. Parties to a contract must be accorded the right to emphasize their similarities and minimize their differences even at the expense of specificity. To say therefore as a general rule that contractual parties must have a specific meeting of the minds on every item in a contract or else expect that each unmentioned item will be treated as a nullity can only have the unfortunate consequence of perpetuating an outdated and mechanical jurisprudence.
 
 
 40
 In Smith v. Kerrville Bus Co., 709 F.2d at 917 (citations omitted), we explained,
 
 
 41
 As the Supreme Court has recognized, a collective bargaining agreement may not anticipate every situation that may arise between employer and employee....
 
 
 42
 Because a collective bargaining agreement is designed to regulate virtually all facets of the employer-employee relationship, and is subject to federal labor law, the construction and application of its terms cannot be narrowly confined by ordinary principles of contract law. Thus the provisions of a labor contract may be more readily expanded by implication than those of contracts memorializing other transactions.
 
 
 43
 Therefore, on remand the finder of fact should examine evidence of objectively manifested intent to determine whether there was in fact a meeting of the minds, and, if so, on what terms the minds met.
 
 B.
 
 44
 The company also argues that there was no breach because the collective bargaining agreement was no longer in force, having been superseded by the Effects of Sale Agreement (ESA) entered into by the union and the company in conjunction with the sale of the company's Pasadena plant in February 1987. The ESA does not mention the May 1986 retirees but provides in pertinent part, "All obligations of the Company arising under the Collective Bargaining Agreement except as provided herein shall cease and that Agreement shall be considered terminated as of the Closing Date." Moreover, the summary description health plan distributed to the retirees pursuant to the May 1986 agreement states that "the company reserves the right to amend, suspend, or terminate the plan at any time for any reason."
 
 
 45
 The union responds that the May 1986 collective bargaining agreement says nothing about the retirees' retirement benefits' ceasing after the agreement terminated. The agreement by its own terms was to continue only until May 29, 1988. It did not expressly say that retirement benefits would cease after that date, and in fact the company continued to provide retirement benefits after February 1987 and after May 1988. Furthermore, the retirees were entitled to coverage under the terms of the collective bargaining agreement up to age 65, and limited coverage even beyond age 65 paid by the company. Many of the early retirees would not reach age 65 until long after the two-year duration of the collective bargaining agreement.
 
 
 46
 In International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1480-81 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), the court found, upon examining the entire collective bargaining agreement at issue, that insurance benefits to retirees were intended to continue beyond the life of the agreement. One provision that the court found significant provided that the company would pay for a retiree's insurance after age 65, but the employee would pay up to age 65; because many retirees would still be under age 65 upon the agreement's termination, if retirement benefits ended at that time, the promise of company payment after age 65 would be completely illusory. Id. at 1481.
 
 
 47
 The court also emphasized the company's conduct in actually continuing retirees' insurance benefits after the date on which it could have terminated them under the interpretation it urged before the court. Id. Moreover, the court found it "unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." Id. at 1482.
 
 
 48
 In addition, the court found that retirees' benefits are "status" benefits that carry an inference that they will continue so long as the prerequisite status is maintained. Id. A union could bargain away nonvested retirement benefits in future negotiations, but not benefits that have already vested in particular retired individuals. Id. n. 8; see also Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971).
 
 
 49
 In the instant case, the company continued to provide retirement benefits for a premium of $15.50 per month for more than ten months after the May 1986 contract was superseded. Furthermore, many of those employees who accepted the company's offer of early retirement were between the ages of 55 and 60; if expiration of the collective bargaining agreement terminated the retiree benefits plan, then the benefits offered "between the date of retirement and age 65" would actually continue until age 65 only for those who were age 63 or older when they accepted early retirement. Also, the offer of benefits to the retiree upon attaining the age 65 would be nugatory for those employees under age 63. Thus, many facts substantially similar to those that underlay the decision in Yard-Man are also present in the instant case.
 
 
 50
 Some other courts have come to conclusions similar to that in Yard-Man. E.g., Keffer v. H.K. Porter Co., 872 F.2d 60, 64 (4th Cir.1989); Local Union No. 150-A, United Food & Commercial Workers Int'l Union v. Dubuque Packing Co., 756 F.2d 66, 69-70 (8th Cir.1985). In other cases, courts have followed reasoning similar to the Sixth Circuit's but have reached different conclusions. E.g., Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 603 (7th Cir.1989) (benefit plan documents unambiguously provided for right to terminate retiree benefits); see also Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1516-20 (8th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989) (unlike Yard-Man court, court found no inference of intent to vest benefits; court examined contractual language and extrinsic evidence); Turner v. Local Union No. 302, Int'l Bhd. of Teamsters, 604 F.2d 1219, 1225 (9th Cir.1979) (distinguishing between vested pension rights guaranteed for the life of the retiree and health and welfare benefits lasting only the life of the collective bargaining agreement).
 
 
 51
 In none of these cases did the court assume as a general principle of law that the termination of a collective bargaining agreement terminates the retirement benefits conferred by that agreement. In each case the court looked to the specific agreement in question to discern whether there was an intent to confer lifetime health insurance benefits on the covered retirees.
 
 
 52
 While the ESA did contain the language, "All obligations of the company arising under the Collective Bargaining Agreement except as provided herein shall cease and that Agreement shall be considered terminated as of the Closing Date," the ESA has no power to displace vested rights. See Yard-Man, 716 F.2d at 1482 n. 8. Thus, in the instant case we must look to the collective bargaining agreement to determine whether there was an intent to vest the benefits with each retiree upon acceptance of the company's offer of early retirement.
 
 
 53
 The agreement itself does not speak to this issue, and no unambiguous inferences arise from its plain language; some of the facts that supported the conclusion in Yard-Man that the retirement benefits vested under the contract as a matter of law are present here, but others are not. Therefore, we remand for interpretation of the language of the agreement in light of extrinsic evidence of intent.[12]
 
 
 54
 REVERSED and REMANDED.
 
 
 
 [1]
 See Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)
 
 
 [2]
 The union also sued under 29 U.S.C. Sec. 1132 for violation of ERISA
 
 
 [3]
 We do not address this question here
 
 
 [4]
 The union is not a party to the agreement on the enrollment forms
 
 
 [5]
 The union's extrinsic evidence, submitted in opposition to the motion for summary judgment, included the summary health plan descriptions for the Pasadena health plan and plans at two other Champion plants, depositions concerning the collective bargaining agreement negotiations, affidavits by retirees that they were never told the premium would increase, and company memoranda. The union also presents course-of-performance evidence to the effect that the company did not raise the retirees' premium until over a year after the Medicare Part B premium had been raised. This evidence is easily sufficient to foreclose our affirming the judgment as a matter of law
 
 
 [6]
 See, e.g., NLRB v. Downs-Clark, Inc., 479 F.2d 546, 548 (5th Cir.1973); Three-Seventy Leasing Corp. v. Ampex Corp., 528 F.2d 993, 995-96 (5th Cir.1976); Calvin V. Koltermann, Inc. v. Underream Piling Co., 563 S.W.2d 950, 956 (Tex.Civ.App.--San Antonio 1977, writ ref'd n.r.e.); but see NLRB v. South Cent. Bell Tel. Co., 688 F.2d 345, 353 (5th Cir.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983) (holding that an earlier arbitration decision was not incorporated into a valid labor contract because, among other reasons, there was no meeting of the minds on whether the contract incorporated the earlier decision); Connecticut Gen. Life Ins. Co. v. Craton, 405 F.2d 41, 45-46 (5th Cir.1968) (rejecting any requirement for an express provision about each contingency as a precondition to finding a meeting of the minds)
 
 
 [7]
 This distinguishes the present case from NLRB v. South Cent. Bell Tel. Co., supra note 6. In that case, contractual silence as to whether the earlier decision was incorporated was consistent with a holding that the decision was not incorporated; that is, a holding that no contractual term was intended on this issue was consistent with the parties' silence. On the other hand, it is apparent here that the parties did intend either that retirees' premium would be fixed at $15.50 or that the premium would vary so as to match the Medicare Part B premium. While the parties' subjective understandings as to which was reflected in their agreement may have differed, to say that the contract embodied neither of these understandings defeats the intent of both parties
 
 
 [8]
 See United States v. Roberts, 436 F.Supp. 553, 558 (E.D.Tex.1977); Adams v. Petrade Int'l, Inc., 754 S.W.2d 696, 717 (Tex.App.--Houston [1st Dist.] 1988, no writ); Slade v. Phelps, 446 S.W.2d 931, 933 (Tex.Civ.App.--Tyler 1969, no writ)
 
 
 [9]
 The parties' conduct demonstrates that they agreed that as long as the Medicare Part B premium was $15.50, the retirees' premium would be $15.50, for as long as the Medicare Part B premium remained $15.50, that amount was deducted monthly from the retirees' pensions. In fact, even after the first increase in the Medicare Part B premium, the company did not raise the retirees' premium for a year
 
 
 [10]
 However, if reference to extrinsic evidence indicates that there was a negotiation impasse on the issue of what would be done when the Medicare Part B premium changes, a failure of the meeting of the minds is more likely
 
 
 [11]
 In the instant case, a failure of meeting of the minds could operate to nullify any attempt to interpret how the contract addresses the issue of whether the retiree premium changes when the Medicare Part B premium changes; but a failure of the minds to meet will not operate to make the entire contract void from inception, since the contract's disposition in the contingency of the Medicare Part B premium is not an essential term of the original agreement. See Calvin V. Koltermann, Inc. v. Underream Piling Co., 563 S.W.2d at 956. The parties intended the agreement to bind them from the outset and acted in conformance with a mutual understanding of that agreement for more than eighteen months
 
 
 [12]
 See Bower v. Bunker Hill Co., 725 F.2d 1221, 1223 (9th Cir.1984) (absent express language regarding duration of retirement insurance benefits, disputed facts created ambiguity in contract, precluding summary judgment). To the extent that Yard-Man held that there is, as a general proposition, an inference of an intent to vest retirement benefits (because they are "status" benefits), we find merit in the Eighth Circuit's criticism in Anderson of this aspect of Yard-Man and find no basis in logic or federal labor policy for such a broad inference. However, we note that this would not prevent the district court from considering, as some evidence of intent, for example, the fact that retirees have no voice in negotiating a new collective bargaining agreement, a fact of quite general applicability to cases where the vesting of retirement benefits is at issue. In other words, this matter must be determined on a contract-by-contract basis