# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 23, 2022

Lyle W. Cayce
Clerk

No. 21-10597

Christopher George Arnone,

*Plaintiff—Appellant*,

*versus*

County of Dallas County, Texas; William T. Hill, Jr., *in his Individual capacity*; Ron Goethals, *in his Individual capacity*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CV-3027

Before Jolly, Willett, and Oldham, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Christopher Arnone struck a plea deal after being charged with sexually abusing his son. While on community supervision, Arnone failed two polygraph tests. The district attorney sought to revoke Arnone's community supervision and proceed to adjudication. Arnone was convicted and sentenced to prison. Years later the Texas Court of Criminal Appeals ordered Arnone released since polygraph results are inadmissible under Texas evidence law. Arnone then sued Dallas County under 42 U.S.C. § 1983. The

No. 21-10597

district court dismissed with prejudice for failure to state a claim. Because the district attorney's actions are not attributable to the county, we AFFIRM.

I

Dallas County prosecutors charged Christopher Arnone with sexually abusing his son. As part of his plea deal, Arnone pleaded nolo contendere to a single charge of felony injury to a child. The state court then placed him on ten-years deferred adjudication community supervision, which included the condition that Arnone submit to sex-offender treatment and polygraph tests.

Arnone was dismissed from sex-offender treatment because he failed two polygraph tests. The district attorney then moved to proceed to an adjudication of guilt. The trial court found Arnone guilty and sentenced him to prison. Nearly thirteen years later the Texas Court of Criminal Appeals ordered Arnone released. The Court explained that "the sole basis for the adjudication of [Arnone's] guilt was his dismissal from sex offender treatment which was based on failing two polygraph tests."[1] That entitled Arnone to release under another CCA decision, *Leonard v. Texas*, which holds that polygraph test results are inadmissible under Texas evidence law because they are "not reliable."[2]

Arnone sued, complaining that the district attorney's use of the polygraph tests amounted to an unconstitutional polygraph policy. He brought claims under 42 U.S.C. § 1983 against Dallas County, former District Attorney William Hill, and former Director of the Dallas County

---

[1] *Ex Parte Arnone*, No. WR-60,218-02, 2015 WL 5853688, at *1 (Tex. Crim. App. Oct. 7, 2015) (per curiam) (unpublished).

[2] *Id.* (citing 385 S.W.3d 570 (Tex. Crim. App. 2012)); *Leonard*, 385 S.W.3d at 582 (emphasis removed).

2

No. 21-10597

Community Supervision and Probation Department Ron Goethals.[3] The district court dismissed Hill and Goethals with prejudice after it dismissed Arnone's Fourth Amended Complaint for failure to state a claim. Arnone repleaded. His Fifth Amended Complaint alleged a single § 1983 claim against Dallas County. Once again the district court dismissed Arnone's complaint; this time with prejudice as to Dallas County.

Arnone timely appealed. His notice of appeal suggested that he was appealing both the dismissal of his claims against Dallas County and the dismissal of his claims against the individual defendants. But Arnone's briefs make no mention of Goethals, let alone an argument supporting a plausible claim against him. Nor do Arnone's briefs make any argument supporting a plausible claim against Hill. We have said before that "[f]ailure adequately to brief an issue on appeal constitutes waiver of that argument."[4] Since Arnone has waived his claims against the individual defendants, we need not address them.[5] All that remains, then, is Arnone's sole § 1983 claim against Dallas County.

II

The standard of review is well settled. To survive a motion to dismiss, a plaintiff must plead his claim with "sufficient factual matter" to make it "plausible on [its] face."[6] Here, the district court concluded that Arnone

---

[3] Arnone also sued other defendants who are no longer parties.

[4] *Robinson v. Guarantee Tr. Life Ins. Co.*, 389 F.3d 475, 481 (5th Cir. 2004) (citations omitted).

[5] Nor do we need to address Dallas County's alternative argument that the district court correctly concluded that the district attorney, himself, was protected by absolute immunity.

[6] *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

No. 21-10597

failed to state a facially plausible claim. We review this ruling de novo, accepting as true all well-pleaded facts in Arnone's complaint.[7]

## III

Arnone contends his Fifth Amended Complaint stated a plausible § 1983 claim against Dallas County under different theories. His first theory is that Dallas County is liable under *Monell v. Department of Social Services*.[8] But if we don't buy his first theory, then Arnone has a second: that Dallas County is liable for failing to train or supervise the district attorney's subordinates. We don't buy either.

## A

We start with Arnone's main argument—that Dallas County is liable under *Monell*. In that case, the Supreme Court held that plaintiffs can bring § 1983 claims against local governing bodies, including counties like Dallas.[9] But *Monell* claims require three elements: "(1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom."[10] Arnone lacks the first.[11]

---

[7] *Id.*

[8] 436 U.S. 658 (1978).

[9] *Id.* at 690.

[10] *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc) (citation omitted).

[11] Thus we need not reach the other two.

4

No. 21-10597

(1)

Dallas County is not liable under *Monell* for just any official policy that violated Arnone's constitutional rights. No. Dallas County can be held liable only for those decided or acquiesced to by a *county* policymaker.[12] A policymaker is an "official[] whose decisions represent the official policy of the local governmental unit."[13] In other words, an official who has "the power to make official policy on a particular issue."[14] When he "speak[s]" on it, his words represent the local government's official policy.[15]

But sometimes a policymaker wears more than one hat. Again, only *county* policymakers count for liability under *Monell*. So what happens when an official sometimes acts for the county, and sometimes acts for another governmental entity, like the state? In those cases, we have to weigh state law and the policymaker's complained-of actions. Only then can we decide which entity is to blame.

The controlling Supreme Court decision on the dual-hat problem is *McMillian v. Monroe County*.[16] In *McMillian* a man was convicted of murder.

---

[12] The Supreme Court explained the relevant inquiry more fully in *Jett v. Dallas Independent School District*:

> Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.

491 U.S. 701, 737 (1989) (citations omitted).

[13] *Id.*

[14] *Id.*

[15] *See id.*

[16] 520 U.S. 781 (1997).

Then he was exonerated. Then, as here, he sued his county under *Monell*. The thrust of his claim was that the sheriff had suppressed exculpatory evidence, among other things.[17] The parties agreed that the sheriff had "'final policymaking authority' in the area of law enforcement."[18] They disagreed, though, over whether the sheriff acted as a state or county policymaker when exercising it. The Court explained that courts do not categorize officials "in some categorical, 'all or nothing' manner."[19] Rather, courts must "ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."[20] That inquiry turns on the official's "actual function" under "relevant *state* law."[21]

Applying those principles, the Court held that the sheriff had acted as a *state* policymaker in *McMillian*.[22] In support, the Court found that the most recent state constitution had added sheriffs to the state's "executive department" and made them impeachable by the state supreme court (rather than the county) for failures in properly enforcing the law;[23] the state supreme court had held that sheriffs were "state officers" and that tort claims against them "based on their officials acts" were "suits against the State," not county;[24] the state code allowed state judges to "order the sheriff to take certain actions," without similarly empowering county officials; the

---

[17] *Id.* at 783–84.

[18] *Id.* at 785.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 786 (emphasis added).

[22] *Id.* at 793.

[23] *Id.* at 787–88.

[24] *Id.* at 789.

state code gave sheriffs "complete authority to enforce the state criminal law in their counties" without reserving any residual law-enforcement authority to the county itself;[25] and the state code gave the state governor and attorney general the power to direct sheriffs in their law-enforcement duties, but none to county officials.[26]

The Court also explained why other provisions "that cut in favor of the conclusion that sheriffs are county officials" did not sway its analysis.[27] The state code provided that the county both paid the sheriff's salary and also provided him with "equipment (including cruisers), supplies, lodging, and reimbursement for expenses."[28] But paying the sheriff's salary did not "translate into control over him," said the Court.[29] And the county lacked discretion to deny the sheriff operational funds below what was "reasonably necessary."[30] "[A]t most," the county's purse-string power "exert[ed] an attenuated and indirect influence over the sheriff's operations."[31] The state code also provided that the sheriff's jurisdiction was "limited to the borders of his county," and that he was "elected locally by the voters in his county."[32] But neither fact mattered much since "district attorneys and state

---

[25] *Id.* at 789–90.

[26] *Id.* at 790–91.

[27] *Id.* at 791.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 791–92.

[32] *Id.* at 791.

judges are often considered . . . state officials, even though they, too, have limited jurisdictions and are elected locally."[33]

Earlier this year we issued our en banc decision in *Daves v. Dallas County*.[34] That decision clarifies how to attribute a policymaker's actions under *McMillian*. In *Daves* the plaintiffs sought injunctive relief under *Monell* against Dallas County, among others, for alleged infirmities with the county's bail system—specifically, that promulgated "bail schedule[s]" created an unconstitutional "wealth-based pretrial detention system."[35] We explained that, under *McMillian*, "we examine function . . . when deciding whether an official is acting for the state or local government in a case brought pursuant to Section 1983."[36] That examination turns on "what state law provides as to the specific relevant function, *i.e.*, the act that is being challenged in the litigation."[37] We also held that *McMillian*'s inquiry is distinct from what we use to decide whether an official is a state actor for Eleventh Amendment purposes.[38]

Applying *McMillian*, we held in *Daves* that Dallas County's judges acted as state policymakers when they promulgated the bail schedules.[39] We reasoned that the state constitution provides that both the county and district

---

[33] *Id.* at 792.

[34] 22 F.4th 522 (5th Cir. 2022) (en banc).

[35] *See id.* at 529–530.

[36] *Id.* at 533.

[37] *Id.*

[38] *Id.* at 534; *see also id.* at 533–34 (explaining the distinctions between the two inquiries).

[39] *Id.* at 540–41.

judges exercise state judicial power as part of their judicial function,[40] and that judges act in their judicial function when they "set[] an arrestee's bail" at the start of adversary proceedings.[41] The only question was whether "creating a bail schedule for later application to specific arrestees is also a judicial act that enforces state law"?[42] We held that it was: "[W]hen judges decide on a procedure for taking what indisputably will be judicial acts in the future, that decision is so intertwined with what will follow as to be a judicial act as well."[43] It made no difference that the judges creating the bail schedules were different from the ones who used them.[44] What mattered was the "inextricabl[e] link[]" to the exercise of state judicial power.[45] And, citing *McMillian*, it did not matter either that the bail schedules' reach was geographically limited to Dallas County.[46] Therefore, the county and district judges acted as state policymakers in promulgating the bail schedules.[47]

---

[40] *Id.* at 537 (citing Tex. Const. art. V, § 1); *see also id.* at 538 ( "[A] municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker."(quoting *Johnson v. Moore*, 958 F.2d, 94 (5th Cir. 1992)).

[41] *Id.* at 539.

[42] *Id.*

[43] *Id.*

[44] *See id.* (calling this a "difference" without a "distinction").

[45] *Id.* at 540.

[46] *Id.* (citing 520 U.S. at 791).

[47] *Id.* at 540–41; *see also id.* at 24 (reasoning that "[m]uch of the foregoing analysis concerning County Judges applies to the District Judges as well").

No. 21-10597

(2)

Applying *McMillian* and *Daves*, the district attorney acted as a state—not county—policymaker in promulgating or acquiescing to the polygraph policy.[48] Relevant Texas law inescapably points that way. And Arnone offers no persuasive counterargument.

*(a)*

To begin, the Texas Constitution supports that the district attorney acts for the state. It provides the Legislature—a state entity—with a direct role in regulating both the scope of prosecutorial duties and compensation for district attorneys.[49] That is like the sheriff in *McMillian* where the Legislature

---

[48] Whether a county policymaker exists is a question of law for the court. *See Jett*, 491 U.S. at 737 ("[T]he trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation."). At the same time, Arnone exclusively pleaded and now argues on appeal that only one county policymaker is responsible for the polygraph policy: the district attorney. We therefore need not reach whether another county policymaker could be responsible. *See Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) ("[W]e have consistently held, 'arguments not raised before the district court are waived and cannot be raised for the first time on appeal.'" (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)); *United Paperworkers Int'l Union AFL-CIO, CLC v. Champion Int'l Corp.*, 908 F.2d 1252, 1255 (5th Cir. 1990) ("[A]ny issues not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal.").

[49] The Texas Constitution provides that:

The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature. The Legislature may provide for the election of District Attorneys in such districts, as may be deemed necessary, and make provision for the compensation of District Attorneys and County Attorneys. District Attorneys shall hold office for a term of four years, and until their successors have qualified.

Tex. Const. art. V, § 21.

had a role in determining both the scope of the sheriff's duties and his compensation.[50]

Texas caselaw from its highest criminal court agrees. As Dallas County points out in its supplemental brief,[51] the Texas Court of Criminal Appeals explained in *Saldano v. Texas* that "[e]very constitution of Texas, as a republic and as a state, has provided for district attorneys to represent Texas in criminal prosecutions."[52] Today, "the State of Texas . . . has given its authority to prosecute [criminal] cases to more than three hundred independently elected prosecutors, each of whom exercises authority in an area of the state no larger than a judicial district."[53] In fact, district attorneys aren't just empowered *by* the state. They *are* the state, complete with designation as "officers of the judicial branch of government."[54]

Finally, Texas statutory law also points towards the district attorney having acted on the state's behalf. The Legislature has provided in the Texas Code of Criminal Procedure that district attorneys "represent the *State*" in criminal cases.[55] Again, that is like how state law in *McMillian* gave the sheriff exclusive jurisdiction to enforce criminal law in the county.[56] Arnone even

---

[50] *See McMillian*, 520 U.S. at 789–791.

[51] We decided *Daves* after briefing was complete, but before oral argument. Consequently, we requested the parties submit supplemental briefing "addressing the impact (if any) that [our] recent en banc decision in 18-11368, *Daves v. Dallas County* ha[d] on [their] arguments." The parties obliged.

[52] 70 S.W.3d 873, 876 (Tex. Crim. App. 2002) (en banc).

[53] *Id.* at 878 (quoting *Texas v. Brabson*, 976 S.W.2d 182, 187 (Tex. Crim. App. 1998) (en banc) (Womack, J., concurring)).

[54] *Id.* (quoting *Brabson*, 976 S.W.2d at 187).

[55] Tex. Code Crim. Proc. art. 2.01 (emphasis added).

[56] *See McMillian*, 520 U.S. at 789–90.

concedes that Dallas County's district attorney draws his "power to seek revocation of probation/deferred adjudication and an arrest warrant" from the state.[57] That is like how, in *Daves*, the county and district judges drew their judicial power to set individual bail from the state.[58] Nowhere does Arnone argue that a grant of authority from Dallas County was necessary to the district attorney's deciding or acquiescing to the polygraph policy, let alone that Dallas County had the power to stop it.

Texas law therefore points one way in this case: district attorneys act for the state when they decide to seek revocation of probation or deferred adjudication. A policy governing when to exercise that power in the future—whether because of a polygraph result, or not—is inextricably linked to that use of state power, just like it was in *Daves*. Therefore, the Dallas County district attorney acted as a *state* policymaker when he decided or acquiesced to the polygraph policy in this case.

*(b)*

Arnone, of course, vigorously contends that the district attorney acted as a county policymaker in this case. He supports his contention with four arguments. We reject them all.

*First*, Arnone argues that *Daves* is distinguishable. Not on the law, mind you. But on its facts. After all, says Arnone, "the majority in *Daves* agrees with what has been Arnone's position all along"—that "we examine

---

[57] *See* Tex. Gov't Code § 44.157 (providing the duties and powers of the Dallas County district attorney). Dallas County adds that we have held that prosecutors acting in their prosecutorial capacity to enforce state laws are agents of the state. In support it cites our previous decisions extending Eleventh Amendment immunity to prosecutors. As we already explained above, though, we held in *Daves* that the Eleventh Amendment inquiry is distinguishable. Therefore, those authorities add little to our analysis.

[58] *See Daves*, 22 F.4th at 537–38.

function, not funding, when deciding whether an official is acting for the state or local government." But when it comes to *Daves*'s facts, Arnone argues that they are too different to make *Daves* applicable here. To be sure, *Daves* involved judges, and this case involves a district attorney. And we will assume, for the sake of argument, that Arnone is right that "none of the actors in Daves took any action before the establishment of probable cause nor did any of those actors participate in the determination of probable cause." But while those may be distinctions, are they *differences*? Hardly. Arnone readily admits that we must look to the *function* the district attorney was performing. And we already explained in detail above how that functional analysis comes out. Who did or didn't decide probable cause and when simply has no relevance.

*Second*, Arnone argues that there's a difference between a general grant of state power and its differing, county-level execution, which requires a county-level policymaker. But we rejected that argument in *Daves*. The county and district judges' decision to promulgate bail schedules governing future uses of judicial power to set bail was inextricably linked with their judicial power to set bail in individual cases.[59] That is analogous to here. The district attorney's promulgating or acquiescing to a policy governing future uses of the power to seek revocation of probation or deferred adjudication is inextricably linked with his power to seek it in individual cases.

*Third*, Arnone argues that the district attorney is geographically limited in his jurisdiction and elected by Dallas voters. But, as we already discussed, the Supreme Court in *McMillian* rejected those very arguments in deciding whether an official acts as a local-government policymaker.[60]

---

[59] *Cf. id.* at 539.

[60] *See McMillian*, 520 U.S. at 791–92.

*Fourth*, Arnone also argues that our decision in *Crane v. Texas* compels us to decide that the district attorney acted for the county in this case.[61] Dallas County unexplainedly ignores *Crane*. Even so, we disagree with Arnone that *Crane* controls here. Put simply, both *McMillian* and *Daves* were decided after *Crane*, and both decisions undermine it.

In *Crane I* we held that Dallas County had "acted through" its district attorney to create "an unsound and legally insufficient" capias system.[62] That system caused misdemeanor arrest warrants to issue without a prior determination of probable cause, as required by Texas law.[63] We reasoned that the district attorney acted for Dallas County since he "was alone responsible for the County system and could change it at will."[64] But *Daves* undermined that reasoning. Like the district attorney in *Crane* and this case, the county and district judges in *Daves* were also alone responsible for an allegedly unconstitutional policy—their bail schedules—that they could change at will. Yet we did not treat that as a dispositive fact to attribute the bail schedules to Dallas County. Instead, we focused on how the county and state judges were exercising their judicial functions—derived from state power—when they promulgated the bail schedules.[65] Thus, given *Daves*, we cannot follow this part of *Crane I*'s reasoning today.

We also briefly remarked in *Crane I* that because the district attorney's capias system had been held by the Texas Court of Criminal Appeals to

---

[61] (*Crane I*) 759 F.2d 412 (5th Cir.), *modified on rehearing*, (*Crane II*) 766 F.2d 193 (5th Cir. 1985) (per curiam).

[62] *Crane I*, 759 F.2d at 430.

[63] *Id.* at 415, 421–22.

[64] *Id.* at 429.

[65] *See Daves*, 22 F.4th at 537–539.

No. 21-10597

"violate[] Texas law . . . it can scarcely be said to represent the official policy of the State of Texas."[66] But that remark was dictum: "[a] statement [that] could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."[67] Our remark fits that definition since we had held by that point in *Crane I* that the district attorney was a county official.[68] Because we are not bound by dicta, our remark from *Crane I* does not bind us today.[69] But even if it could have been binding, it, too, has since been undermined. Again, both *McMillian* and *Daves* explain that what matters is the precise "function" that the policymaker is exercising.[70] Whether the specific application of that function represents official policy of the state or not does not enter into our analysis. And it does not act as a bright-line rule for attributing policymaker actions to local governmental units.

In *Crane II* we supplemented our holding in *Crane I* on rehearing. We also reasoned that the district attorney's status as a locally elected official favored classifying him as a county official.[71] But as we already explained

---

[66] *Crane I*, 759 F.2d at 432.

[67] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 427–28 (5th Cir. 2014) (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)); *see also id.* at 428 ("[I]f the statement is 'necessary to the result or constitutes an explication of the governing rules of law,' it is not dictum." (citation omitted)).

[68] *Cf. id.* at 430.

[69] *Texas v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 415 n.39 (5th Cir. 2020) ("[W]e are free to disregard dicta from prior panel opinions when we find it unpersuasive." (quoting *Crose v. Humana Ins. Co.*, 823 F.3d 344, 349 n.1 (5th Cir. 2016))).

[70] *McMillian*, 520 U.S. at 786; *Daves*, 22 F.4th at 533 (citing *McMillian*, 520 U.S. at 786).

[71] *Crane II*, 766 F.2d at 195.

15

No. 21-10597

above, *McMillian* rejected that reasoning.[72] We also supported our reasoning in *Crane II* with a pragmatic concern: states be could insulating municipalities from *Monell* liability through "ingenious" arrangements.[73] For example, states might assign state officials, who are entitled to Eleventh Amendment immunity, to act as policymakers for local governing bodies.[74] While those arrangements remain troubling, *McMillian* and *Daves* no longer leave room for us to police them. What matters under *McMillian* and *Daves* is the specific function the policymaker exercised under *state* law.[75] Perhaps our concern retains its validity in the Eleventh Amendment context, which is governed by *federal* law.[76] Since we held in *Daves* that the Eleventh Amendment inquiry is distinguishable from *Monell*'s,[77] though, that fails to help Arnone's argument.

*     *     *

At end, then, Dallas County's district attorney may very well be elected only by its voters. He may hold sway only in Dallas County. And he may even have complete dominion over the internal policies and procedures used within his office. But on these facts, the Dallas County district attorney acted for the state—not county—when he promulgated or acquiesced to the

---

[72] In fact, the Eleventh Circuit, which decided *McMillian* before the Supreme Court affirmed its opinion, explicitly disagreed with our reasoning in *Crane II* that "election by county voters" is a "significant, if not dispositive, factor in holding counties liable for the officer's actions under § 1983." *McMillian v. Johnson*, 88 F.3d 1573, 1582 n.6 (11th Cir. 1996). That casts even further doubt on the factor's significance in attributing an official's actions to a county.

[73] *Crane II*, 766 F.2d at 195.

[74] *Id.*

[75] *Daves*, 22 F.4th at 533 (citing *McMillian*, 520 U.S. at 786).

[76] *Id.* at 534 (citation omitted).

[77] *Id.* at 533–34 (explaining the distinctions between the two inquiries).

polygraph policy. Consequently, there isn't a county policymaker to support Arnone's *Monell* claim. Therefore, the district court properly dismissed it.

B

Arnone also argues an alternative theory for holding Dallas County liable under § 1983—that it should have better supervised or trained its prosecutors. Maybe Arnone has a winning argument.[78] But we can't tell because, as Dallas County puts it, Arnone has "inexplicably" failed to "address the legal basis for the district court's determination that [he] failed to plead" it. What drove that determination? Our decision in *Mowbray v. Cameron County*.[79]

In *Mowbray*, a woman sued a Texas county and alleged it had "failed to train [its prosecutors] on their *Brady* duties."[80] We rejected the claim because the prosecutors were "state officers," and so "the county cannot be liable for a failure to train them."[81] Admittedly we did not do much more than that to explain why local-governmental units cannot be liable on a failure-to-train-or-supervise theory when state officers are responsible for constitutional violations. Even so, *Mowbray* also involved Texas prosecutors;[82] our analysis above tracks *Mowbray*'s that Dallas County's

---

[78] Arnone had to plead three elements: (1) Dallas County must have "failed to train or supervise the [prosecutors] involved"; (2) "there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights"; and (3) "the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

[79] 274 F.3d 269, 278 (5th Cir. 2001).

[80] *Id.*

[81] *Id.*

[82] *See id.* at 280.

No. 21-10597

district attorney acted for the state; and Arnone makes no effort to explain why *Mowbray* does not bind us under the rule of orderliness.

Without a distinction, then, Arnone cannot avoid *Mowbray*. We are therefore bound to agree with the district court that Arnone has failed to plausibly plead his failure-to-train-or-supervise theory against Dallas County.[83]

## IV

Summing up: There is no county policymaker here to support Arnone's § 1983 claim under *Monell*. Nor can Arnone explain why we aren't bound to reject his failure-to-train-or-supervise claim under *Mowbray*. Accordingly, we AFFIRM.

---

[83] *See United Paperworkers*, 908 F.2d at 1255 (explaining that issues not raised in the appellant's opening brief are waived).